[No. 891.   Decided March 24, 1893.]

EDMUND SEYMOUR, *Appellant*, v. THE CITY OF TACOMA, HERBERT S. HUSON, S. J. SMYTH AND TACOMA LIGHT AND WATER COMPANY, *Respondents*.

MUNICIPAL CORPORATIONS — PURCHASE OF WATER WORKS — ISSU-ANCE OF BONDS — SUBMISSION TO VOTERS — REGISTRATION — TITLE OF ACT.

The provision of the act of March 26, 1890 (Laws 1889-90, p. 520), authorizing cities to purchase water works and light plants which had theretofore been erected by private enterprise, is sufficiently expressed in the title of the act, which reads, "An act authorizing cities and towns to construct internal improvements, and to issue bonds and pay therefor."

An ordinance providing for the purchase by a city of the existing plant of a light and water company, embracing its water works and electric light plant, with a certain exception, and that the city extend the water works by a gravity system from certain springs, is sufficient without the ordinance containing a schedule showing the extent of territory covered, the miles of pipe laid and of what sizes, the sources of water supply and the extent of the rights of the seller therein, the quantity of water available, and if brought to the

city in aqueduct or flume, of what capacity, the capacity of the pumping stations and their character, and the amount of land and where situate.

Under the act of March 26, 1890 (Laws 1889–90, p. 520), and the amendment thereof (Laws 1891, p. 326), the question of purchasing water works and light plant, and paying therefor with the proceeds of bonds, may be submitted to the voters at the same election as one proposition.

It is not necessary that the ordinance itself providing for the purchase of water works should be set out in full in the election notice where the latter contains a fair statement of the matters to be voted upon.

There is no state law requiring registration of voters at elections to decide upon propositions for purchasing water works and light plants, and bonding the city to pay therefor.

*Appeal from Superior Court, Pierce County.*

*Alfred E. Buell,* for appellant.

*F. H. Murray,* and *Galusha Parsons,* for respondents.

The opinion of the court was delivered by

STILES, J.— The appellant sought to enjoin the holding of an election in the city of Tacoma, looking to carrying out the scheme which is set forth in the following ordinance:

## "ORDINANCE No. 790.

"An ordinance to provide for the purchase of the water works and electric light plant, and all such water supplies, riparian rights, rights-of-way, lands, lots, personal property and franchises as are now owned or operated by the Tacoma Light and Water Company as part of such water and electric light plants, excepting their distributing system in the town of Puyallup; and for extending said water works and making additions thereto by the adoption of a gravity system of water works; to declare the estimated cost of said additions and extension; to provide for borrowing money to be used in payment therefor by issuing the negotiable coupon bonds of said city for the sum of two million one hundred and fifty thousand dollars; and to provide for calling a special election for submitting such questions to the qualified voters of said city for their ratification or rejection.

*"Be it ordained by the City of Tacoma:*

"SECTION 1. That the offer of the Tacoma Light and Water Company to sell the water works and electric light

plant, and all such sources of water supplies, riparian rights and rights-of-way, lands, lots, personal property and franchises as are now owned or operated by the Tacoma Light and Water Company, as part of such water and electric light plants, excepting their distributing system in the town of Puyallup, for the sum of one million seven hundred and fifty thousand dollars, be and the same is hereby submitted to the qualified voters of the city of Tacoma upon the terms and subject to the conditions hereinafter particularly specified.

"Sec. 2. If said city shall become the owner of said water works and electric light plant and sources of supply, it will extend said water works by additions thereto by a gravity system, so that the same shall be sufficient to adequately supply the said city and its inhabitants with pure, fresh water sufficient for all their necessary uses, which extensions shall be substantially as follows: Thirty-eight-inch conduit pipe from Patterson and Thomas springs to the reservoir of the Tacoma Light and Water Company in the city of Tacoma, distant from said Patterson springs about sixteen miles, and distant about thirteen miles from said Thomas springs; connections from reservoir site to station 'B' of the Tacoma Light and Water Company, near the intersection of Hood and O streets in said city; the erection of a hydraulic pump at a suitable junction of the waters of said springs; the estimated cost of which extensions is four hundred thousand dollars.

"Sec. 3. For the purpose of borrowing money to be used in payment for said water works, electric light plant and sources of supply, and for the construction of said extension to said water works, the city of Tacoma shall issue its negotiable coupon bonds for the sum of two million one hundred and fifty thousand dollars, payable to bearer twenty years from the date thereof, with interest at the rate of five per centum per annum, payable semi-annually; both principal and interest shall be payable in gold coin of the United States of America of the present standard of weight and fineness, at such banking house or trust company in the city of New York as shall be designated in said bonds.

"Sec. 4. The mayor is hereby authorized and directed, in case of the ratification by the qualified voters of said

city, at an election for the submission of said proposition as hereinafter provided, to issue in the name of said city, signed by himself as mayor, attested by the city clerk under the seal of said city, and countersigned by the city controller, two thousand one hundred and fifty negotiable coupon bonds of one thousand dollars each, to be designated upon the face thereof 'Water and Light Bonds of the City of Tacoma,' with interest thereon as provided in the third section hereof; which bonds shall be numbered respectively from one to two thousand one hundred and fifty, and shall, when so signed, attested and countersigned, be delivered by the mayor to the sinking fund commission of said city for sale and negotiation, as hereinafter provided.

"SEC. 5. The said sinking fund commission shall negotiate the sale of said bonds, after having duly advertised the same for sale at least thirty days preceding the day of sale: *Provided*, That said bonds shall not be sold for less than par and accrued interest. Said sinking fund commission shall, immediately upon the receipt of the moneys received for said bonds, pay all moneys so received into the city treasury.

"SEC. 6. In case of the ratification of the said proposition by the qualified voters of said city, at the special election herein provided for, the said sinking fund commission is authorized and instructed, upon the execution and delivery by the said Tacoma Light and Water Company of a good and sufficient deed, with covenants of warranty to vest in said city a perfect title to said water works, electric light plant and sources of supply, said deed to be approved by the city council, to pay out of the money received for the sale of said bonds, to the said Tacoma Light and Water Company, the sum of one million seven hundred and fifty thousand dollars, the same to be accepted by said company in full payment therefor.

"SEC. 7. That a special election be held in and for said city upon the eleventh day of April, A. D. 1893, for the purpose of submitting to the qualified voters thereof the question, whether said city shall purchase the water works and electric light plant and the sources of supply owned by said Tacoma Light and Water Company, for the sum of one million seven hundred and fifty thousand dollars, and

construct additions and extensions thereto at an estimated cost of four hundred thousand dollars; and whether said city shall borrow the sum of two million one hundred and fifty thousand dollars, to be used for the payment therefor, and issue its negotiable coupon bonds for said sum.

"SEC. 8. The form of ballot to be used at said election shall be: 'Shall the city of Tacoma purchase the water works and electric light plant and sources of supply of the Tacoma Light and Water Company for the sum of one million seven hundred and fifty thousand dollars; and construct extensions to said water works at an estimated cost of four hundred thousand dollars, and borrow the sum of two million one hundred and fifty thousand dollars, to be used for said purpose, and issue its negotiable coupon bonds therefor.' All persons in favor of said proposition shall vote as follows: 'For the purchase of the water works, electric light plant and sources of supply of the Tacoma Light and Water Company, and the construction of extensions to said water works, and the issuing of negotiable coupon bonds of the city therefor.' Those voting against said proposition shall vote as follows: 'Against the purchase of the water works, electric light plant and sources of supply of the Tacoma Light and Water Company, and construction of extensions to said water works, and the issuing of the negotiable coupon bonds of the city therefor.'

"SEC. 9. Said election shall be held at such voting places in the several precincts of said city, and shall be conducted by such judges and inspectors of elections, as may be hereafter designated and appointed, and shall be conducted in all respects as provided by the charter of said city and the general laws of the State of Washington. The city clerk shall give at least thirty days' notice of the time, place and purpose of said election, and of the proposition to be submitted thereat, together with the form of ballot to be used; which notice shall be published in the city official newspaper for thirty days next preceding said election, and shall be posted for the like period at all of the places designated therein for holding said election.

"SEC. 10. This ordinance shall, immediately after its passage and approval by the mayor, be published in the official newspaper of said city for three days consecutively,

and shall take effect upon the expiration of such publication.''

The following are the points raised as objections to the validity of the ordinance as the basis for the popular vote on the proposition to be submitted:

1. The action sought to be taken by the city is under authority of, and in accordance with, the provisions of the act relating to internal improvements in cities and towns, approved March 26, 1890 (Laws 1889–90, p. 520), as amended March 9, 1891 (Laws 1891, p. 326); and it is contended that this act, in so far as it is a grant of power to ''*purchase*,'' is void for the reason that it is not mentioned in the title of the act which relates merely to ''*construction*.''

2. The ordinance fails to specify the works and plant with sufficient detail to enable the taxpayers to determine, without going to other sources of information, the expediency of purchasing the property offered, and at the price named.

3. The act provides that the ratification of the system or plan proposed and the assent to the incurring of indebtedness shall be submitted to the voters as separate questions.

4. The ordinance provides by its terms that the proposition therein contained shall be submitted to the voters, while the act requires that the ordinance itself shall be submitted.

5. The amendments to the registration law enacted in 1893 having become a law March 7th, there could be no election April 11th, because the terms of the law and certain provisions of the city charter would not give sufficient time for a fair or effective registration of voters.

The city of Tacoma is a city of the first class, organized under a freeholders' charter in 1890, and its position is, that as a city of that class it is not dependent upon the act of 1890, above referred to, either for its authority to pur-

chase water or light plants, or for its power to issue bonds therefor; nor is it bound by the requirements of that act when it proceeds to acquire property of the character here in question.   In support of this position our attention is called to the fact that the original legislative charters of the same city all had more or less in them in the way of authority to provide and maintain water works (Laws of 1875, p. 168;  1881, p. 75;  1883, p. 319;  1886, p. 197); in some of them the maintenance of lighting systems was included; and purchase was more than once specified as the means by which such institutions might be acquired.

And again it is pointed out that two days before the act of March 26, 1890, was approved, another act, known as the "enabling act" (Laws 1889–90, p. 215), for cities of the first class, was approved, with the following as powers expressly enumerated in § 5:

"Paragraph 14.  To provide for erecting, *purchasing* or *otherwise acquiring* water works within or without the corporate limits of said city, to supply said city and its inhabitants with water, or to authorize the construction of same by others when deemed for the best interests of such city and its inhabitants, and to regulate and control the use and price of the water so supplied.

"Paragraph 15.  To provide for lighting the streets and all public places, and for furnishing the inhabitants thereof with gas or other lights, and to erect or *otherwise acquire* and to maintain the same, or to authorize the erection and maintenance of said works as may be necessary or convenient therefor, and to regulate and control the use thereof."

The fourth paragraph of the same section authorized the borrowing of money for corporate purposes and the issuance of negotiable bonds therefor in such manner as should be prescribed in its charter; and this provision was somewhat amplified in the charter adopted.   Unquestionably, if the act of March 26, 1890, had never been passed, the provisions of the act of March 24th must have been

held to empower the city of Tacoma to acquire water and lighting plants and to issue negotiable bonds to pay the cost of the same; and if her charter prescribed the manner and conditions of issuing the bonds, in compliance with the constitutional requirements, she could now proceed without hindrance from this appellant on the grounds here alleged. This inferentially appears from the language of "paragraph four," above mentioned, which limits the indebtedness possible to ten per cent. of the city assessment roll; whereas, under the constitution, all above five per cent. would be void unless procured for water, light or sewers. Whether the charter does prescribe any manner or conditions of issuing bonds, we shall not now examine, however, for reasons which we think are found in the law, and which obviate the necessity of it.

Prior to the acts of 1890, so often mentioned, cities did not have the right to create indebtedness by the issuance of negotiable bonds. The act of February 26th (Laws 1889–90, p. 225) extended to every incorporated town then existing the right to borrow money and fund its debts in aid of municipal purposes. The enabling act of March 24th continued these rights to such cities of the first class as chose to come under its provisions; but the general municipal incorporations act of March 27th withheld these powers from cities of the lower classes, until 1891, when the oversight was corrected by the act of March 7th of that year (Laws 1891, p. 261), and all cities in the state, whether old or new, were placed upon the same footing. All cities, however, were empowered, by the act of March 26, 1890, to construct internal improvements, and to issue bonds to pay therefor. At that time the city of Tacoma was existing under its charter of 1886; for although on March 24th the "enabling act" had been approved, with an emergency section, it was a mere dormant statute until each city to which it was applicable should elect to adopt

10—6 WASH.

a charter in accordance with its requirements. In the meantime the act of March 26th was the source of its power, the measure of its authority and the law of its proceedings in the construction of internal improvements by the issuance of bonds to pay therefor.

But with this law thus impressed upon her, and under the proviso of the constitution that in framing her freeholders' charter she must make it consistent with, and take it subject to, the laws of the state, it is suggested that because of the powers enumerated in the "enabling act" the general law existing at the time she adopted her new charter (the act of March 26th) should be held to be no longer of any binding force as to her. The answer to this proposition, it seems to us, is found in the further expression of the constitution (art. 11, § 10), that the new charter should "supersede any existing charter [of 1886] including amendments thereto, and all special laws inconsistent with such charter." General laws were not to be affected and cannot have been affected unless there be found in the "enabling act" such positive expressions as would amount to a repeal of the general law, *pro tanto*, under the rules for interpreting statutes.

But the mere fact that the power to provide water works, light plants and sewers, and to pay for them with money raised by bonds, is conferred over again would not suffice to construe a repeal therefrom. All that is necessary to harmonize the two laws is to construe the authority to borrow money and issue bonds contained in paragraph four of the fifth section, as subordinate to the provisions of the other act which was passed at a later day, although in the same session; and we believe that when this is done the true intent of the legislature will be carried out.

Now to consider appellant's points in their order:

1. The subject of the act of March 26, 1890, included the purchase of water works and light plants which had

theretofore been erected by private enterprise. The first section proves it to a verbal demonstration. The title, however, is: "An act authorizing cities and towns to *construct* internal improvements, and to issue bonds and pay therefor, and declaring an emergency." Ordinarily, the meaning of the word "construct" in the sense here meant would be to build or make; but to give the law any effect whatever, it must have been known to the legislature that more than the mere cost of construction involving the labor necessary would have to be implied. In making every such improvement, the machinery and piping must be purchased, and they constitute a very large proportion of the cost. But that is not all. In building systems of water works especially two other things must be looked after, unless the cities for which they are provided lie immediately upon the lake or stream which furnishes the source of supply; these are the right to take water, and the necessary land for rights-of-way, reservoirs and buildings for machinery.

If one should contract with another for the construction of a house, no one would suppose for a moment that the agreement to "construct" implied an agreement to furnish the land whereon the house must stand; but a gross contract to "construct" a system of water works for the city of Tacoma, with Green river as a source of supply, and turn it over ready for operation, would certainly imply that when the works were finished the perpetual right to have them remain where they were, with the waters of Green river flowing into them, should be secured to the city. Thus, under this power to construct, all but the mere labor would be accomplished by purchase in most cases, and there would seem to be no good reason why water rights, land, pipes and machinery should not be purchased, although they be already in use for a like purpose. The labor only is, therefore, left unprovided for.

Moreover, at the time this law was passed, it was supposed by the legislature, as the body of the act shows, that

some of the cities of the state already had, or would have, both water and lighting systems, the property of private persons or corporations which it would be desirable to acquire; and probably the expression of the authority to purchase or condemn such existing plants was due to the economical reason that wherever such private works are of anything like adequate capacity to supply the requirements of the cities in which they exist, the successful operation of rival works by those cities would be more than doubtful, since all such businesses are in their nature monopolies and not subject to the ordinary laws of supply and demand. It might be that in some cases an existing water company would be in possession of the only practicable supply, with a complete system of machinery, reservoirs and distributing pipes, and it might even, in such an instance, be desirable that the city should own and operate its own water works.    But it would be oppression of the most tyrannical kind to take away from the water company its source of supply without at the same time taking the rest of its plant; and yet that city, according to the argument of the appellant, would be shut out from the benefit of this law.

As showing how the legislature which passed this act regarded the matter, we may refer to the emergency section. After having provided in the first section for constructing, purchasing, condemning, adding to and maintaining these works, the seventh section recited that, whereas there was no law in this state authorizing cities and towns to construct internal improvements and to issue bonds to pay therefor, an emergency existed which justified its immediately taking effect.    Now an emergency clause in our legislation is the last thing passed upon, after the bill itself has received a constitutional majority in both houses.    So there could have been no misunderstanding, and the word "construct" was supposed to be sufficient to cover all that was granted in the first section.

The object of the requirement that the subject of an act

shall be expressed in its title is, that no person may be deceived as to what matters are being legislated upon. The real purpose of this act would have been better expressed had the word "provide" been used, but we think the word "construct," under all the circumstances, may be accorded a similar meaning, rather than to defeat the operation of what is probably the most important feature of this law, upon the technical significance of a word, where it can hardly be contended that anyone was likely to be deceived. As the constitution has not indicated the degree of particularity necessary to express in its title the subject of an act, the courts should not embarrass legislation by technical interpretations based upon mere form or phraseology. The objections should be grave, and the conflict between the statute and the constitution palpable, before the judiciary should disregard a legislative enactment upon the sole ground that the double subject was not fully expressed in the title. *Montclair v. Ramsdell*, 107 U. S. 146 (2 Sup. Ct. Rep. 391).

2. As to the second point, we think the ordinance was sufficient. What was said by this court in *Metcalfe v. Seattle*, 1 Wash. on page 300 (25 Pac. Rep. 1010), as to the necessity of disclosing to the voters the system or plan of works proposed, is invoked to support the proposition that the ordinance should contain a schedule showing the extent of territory covered, the miles of pipe laid and of what sizes, the sources of water supply and the extent of the rights of the seller therein, the quantity of water available and how brought to the city, and if in an aqueduct or flume, of what capacity, the capacity of the pumping stations and their character, the amount of land and where situate.

The statute does not require any such thing, nor do we think it would be reasonable in any case to require it. If it were proposed to construct anew all of the works intended to be purchased in this case, no such particular

inventory could be expected, and it would not be necessary to have it in order that the entire scheme might be made known to the voters.

The system or plan here is to be—*First*, The existing plant of the Tacoma Light and Water Company, embracing its water works and electric light plant, excepting its distributing system in the town of Puyallup; *secondly*, an extension of the water works by a gravity system from the Patterson and Thomas springs, sixteen and thirteen miles distant, respectively. If any person who has been a resident of the city of Tacoma long enough to vote upon the question cannot understand this as a system or plan, he would never do so upon reading a schedule of pipes, pumps, etc. It might as well be demanded that both chemical and microscopical analyses of the water from each source of supply be made a part of the ordinance. The quality of the water would be a very important item of consideration in connection with any scheme of this kind; but the statute was not intended to prescribe details. Something must be entrusted to the mayor and council, and it is to be presumed that they will see after titles, size of pipes, capacity of pumps, permanency and purity of supply, and all such matters of detail, and that general information will naturally be diffused through the community upon all these subjects during the period of notice.

3. Under the amendment to § 2 of the act, made in 1891 (Laws, p. 326), if the city authorities desire, they may submit two propositions to the voters at the same election, viz.: (1) Will you adopt this system or plan and pay therefor out of the current revenue? (2) Will you adopt it and pay for it with the proceeds of bonds? On the other hand, either proposition may be submitted alone, as is intended in this case. The mere adoption of the system or plan would not amount to anything in any case, unless a means of payment went with it; and this is especially so where

an expensive plant is to be purchased.  The change in the language of the statute has not bettered it.  It is still awkward.  But in our judgment it either means just what it did before, or it means nothing, so far as providing these works without going into debt is concerned.  We will not convict the lawmakers of an absurdity by holding that they meant that a system or plant might be adopted without regard to realization or payment.

But, it is said, the voters in this case might be willing to adopt the system proposed, but not at the price named; to which it is enough to say that the statute does not contemplate trial or half-way elections.  It must be presumed in any such case that the city authorities have done their part, and that the proposal submitted is in their judgment wise; after which the voters must say whether they are satisfied to have the round proposition adopted or rejected.

4. It is conceded by appellant that the electors are not called upon to vote for or against the ordinance, but he contends that the election notice should contain the ordinance in full in order that the voters may be apprised of the exact proposition submitted.

By § 47 of the charter, every ordinance is required to be published in the official newspaper for three days consecutively, within ten days after its passage.  After this a thirty days' publication of a notice of election, containing a fair statement of the matters to be voted upon, ought to satisfy all reasonable requirements.  The city is not called upon to thrust information upon the electors, but to give them fair notice of what is proposed, and an opportunity to express their will.  If they take any interest in the subject of the election it is not unreasonable that they should themselves be at the trouble to become fully informed, and there is little danger that they will fail in that respect.

5. We have but one registration law in this state, which is found in chapter 8, Gen. Stat.  Sec. 467 declares that

the provisions of the law shall apply to all elections for municipal and other *officers;* but we fail to find any application of it to elections of this kind. Sec. 9 of the charter requires registration ''as provided by the general laws of the state;'' and § 13 declares that no person shall be entitled to vote unless he is a qualified elector under the state laws, and has registered ''as provided by law.'' But, there being no state law requiring registration at elections of this character, these provisions of the charter are inoperative, and any elector can vote. The amendments to the registration law passed in 1893 do not affect this matter.

The points of objection having all been resolved in favor of the respondents, it follows that the judgment should be affirmed, and it is so ordered.

DUNBAR, C. J., and HOYT and SCOTT, JJ., concur.

ANDERS, J., not sitting.