## BAKER v. SWIGART et al.

### (Circuit Court of Appeals, Ninth Circuit. October 7, 1912.)

#### No. 2,125.

**1. STATUTES (§§ 217, 219, 220*)—RULES OF CONSTRUCTION.**

If the provisions of a statute are uncertain, conflicting, or ambiguous, it becomes the proper subject for construction by the court, in which event, and in aid thereof, resort may be had to any construction put upon it by subsequent acts of the same legislative body, or by the department of the government charged with its execution, and reference may also be had to the legislative debates during the pendency of the enactment.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 293, 296, 297, 298; Dec. Dig. §§ 217, 219, 220.*

History and passage of statute and contemporary circumstances as aids to construction, see note to Mosle v. Bidwell, 65 C. C. A. 535.]

**2. WATERS AND WATER COURSES (§ 222*)—RECLAMATION ACT—CONSTRUCTION —AUTHORITY OF SECRETARY OF INTERIOR—COST OF MAINTENANCE OF WORKS.**

Under the provision of Reclamation Act June 17, 1902, c. 1093, § 6, 32 Stat. 389 (U. S. Comp. St. Supp. 1911, p. 666), authorizing and directing the Secretary of the Interior to use the reclamation fund created by the act "for the operation and maintenance of all reservoirs and reclamation works constructed under the provisions of this act, provided that, when the payments required by this act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense," etc., and especially in view of the provision of section 4 that the charges against the land which the Secretary is authorized to fix and collect in annual installments "shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project," the Secretary has no authority to make additional annual assessments for the cost of maintenance prior to the time when the management passes to the landowners.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 222.*]

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Suit in equity by D. P. Baker against Charles H. Swigart, E. McColloh, and R. K. Tiffany. Decree for defendants, and complainant appeals. Reversed.

For opinion below, see 196 Fed. 569.

W. T. Dovell and Hughes, McMicken, Dovell & Ramsey, all of Seattle, Wash., for appellant.

Oscar Cain, U. S. Atty., and E. C. Macdonald, Asst. U. S. Atty., both of Spokane, Wash., and E. W. Burr, Sp. Asst. Atty. Gen., of North Yakima, Wash., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ROSS, Circuit Judge. This appeal is from a decree entered after a hearing upon bill and answer. In his amended bill the complainant alleged that, being the owner of certain lands in Yakima county, state of Washington, he made application for a water right under the Sunnyside Unit of the Yakima Project, the same being a project of the United States Reclamation Service, under the provisions of the act of Congress commonly known as the "Reclamation Act," approved June 17, 1902. The bill alleged a compliance by the complainant with all of the requirements of the act, and an acceptance of his application by the Secretary of the Interior, thus constituting between the United States and himself a contract under its provisions, whereby the government was to furnish, and he was to receive, out of a ditch called the "Sunnyside Ditch," three acre feet of water per acre for his tract of land, paying therefor at the rate of $52 per acre in 10 annual installments, as provided in the application. The bill further alleged that thereupon, and in reliance upon the contract, the complainant cultivated his land, and that there was furnished him, out of the ditch and the laterals connected therewith, water to irrigate the same, so that at the time of the filing of the bill the complainant had upon his tract a growing crop of alfalfa; that such water was and is necessary for the cultivation of his land and the maturing of his crops, and that there was and is no other source than the Sunnyside Ditch from which to secure water; that in the midst of the irrigating season, to wit, about the month of June, in the year 1911, the defendants to the bill, who are the appellees here, claiming to act as officers of the Reclamation Service of the United States, wrongfully and without warrant of law made an assessment against the complainant to the extent of 95 cents per acre for the use of the water, and demanded payment thereof; that the complainant refused to pay the charge so assessed, and thereupon the defendants, claiming to act as officers of the Reclamation Service, wrongfully and without warrant of law shut off the water from the complainant's land, and threatened to continue to refuse to supply any water therefor, unless the complainant should pay upon demand charges from time to time assessed, in the manner above indicated, against the land of the complainant, as a pretended charge for the maintenance of the said ditch; that the charge was arbitrarily fixed, without authority of law, and without regard to the actual cost of maintaining the ditch, and that the defendants threatened to collect the charge so assessed, and, if the same was not paid upon demand, to refuse the complainant water from the ditch for use upon his land.

The defendants answered the amended bill, and pleaded, among other things, in justification of the allegations of the amended bill in respect to the arbitrary assessment of 95 cents an acre and the coercive attempt to collect the same, as follows:

"For answer unto paragraph VII of the amended bill, defendants say that the Secretary of the Interior on November 18, 1908, fixed a charge for the operation and maintenance under said Sunnyside Unit for the year 1909, and until further notice, at ninety-five (95) cents per acre per annum, which said order has not since been abrogated, modified, or changed, and is now

in full force and effect, and the defendant [plaintiff] has at all times heretofore paid such operation and maintenance fee as required by said order of the Secretary of the Interior."

[1] The sole point presented for decision is whether the act of Congress of June 17, 1902 (32 Stat. 389), requires the cost of operation and maintenance of the ditch in question to be paid by the water users prior to the time when the payments required by the act shall have been made for the major portion of the lands irrigated from the waters of the particular works in question. The first thing to do in such a case is to see just what the lawmaking power has enacted. If the provisions of the statute are plain and unambiguous, the courts must accept the law as there declared; otherwise, they would usurp the function of the legislative department of the government. Of course, if the provisions of the statute in question be uncertain, conflicting, or ambiguous, they become the proper subject for construction, which is a function of the court, in which event, and in aid thereof, resort may be had to any construction put upon it by any subsequent act of the same legislative body, if such there be, and to the construction placed thereon by that department of the government charged with the execution of the law, and, in order that the court may be enlightened in its effort rightly to construe the language employed in the statute, reference may also be had to the legislative debates during the pendency of the enactment. These observations are so well supported by the authorities as to make extended reference to them unnecessary. We therefore cite only, among the many to that effect, Houghton v. Payne, 194 U. S. 99, 24 Sup. Ct. 590, 48 L. Ed. 888; Fairbank v. United States, 181 U. S. 310, 21 Sup. Ct. 648, 45 L. Ed. 862; Hamilton v. Rathbone, 175 U. S. 421, 20 Sup. Ct. 155, 44 L. Ed. 219; United States v. Goldenberg, 168 U. S. 102, 18 Sup. Ct. 3, 42 L. Ed. 394; Lake County v. Rollins, 130 U. S. 670, 9 Sup. Ct. 651, 32 L. Ed. 1060; United States v. Tanner, 147 U. S. 661, 13 Sup. Ct. 436, 37 L. Ed. 321; United States v. Alger, 152 U. S. 384, 14 Sup. Ct. 635, 38 L. Ed. 488; Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179; Bate Refrigerating Company v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508, 39 L. Ed. 601; St. Paul, etc., Railway Company v. Phelps, 137 U. S. 528, 11 Sup. Ct. 168, 34 L. Ed. 767.

[2] Looking at this statute, it is seen that by its first section it is provided that all moneys received from the sale and disposal of public lands in certain named states and territories (Washington among them), and with certain exceptions not important to be mentioned, shall be and are—

"reserved, set aside, and appropriated as a special fund in the treasury to be known as the 'Reclamation Fund' to be used in the examination and survey for and the construction and maintenance of irrigation works, for the storage, diversion and development of waters for the reclamation of arid and semi-arid lands in the said states and territories, and for the payment of all other expenditures provided for in this act; provided," etc.

By the second section of the act the Secretary of the Interior was authorized and directed to make examinations and surveys for, and

to locate and construct, as therein provided, irrigation works for the storage, diversion, and development of waters, including artesian wells, and to report to Congress at the beginning of each regular session the results of such examination and surveys, and other matters not here necessary to state. By the third section the Secretary of the Interior was, among other things, authorized to determine whether or not the particular irrigation project is practicable and advisable; and the fourth, fifth, sixth, and tenth sections of the act are as follows:

"Sec. 4. That upon the determination by the Secretary of the Interior that any irrigation project is practicable, he may cause to be let contracts for the construction of the same, in such portions or sections as it may be practicable to construct and complete as parts of the whole project, providing the necessary funds for such portions or sections are available in the reclamation fund, and thereupon he shall give public notice of the lands irrigable under such project, and limit of area per entry, which limit shall represent the acreage which, in the opinion of the Secretary, may be reasonably required for the support of a family upon the lands in question; also of the charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project, and the number of annual installments, not exceeding ten, in which such charges shall be paid and the time when such payments shall commence. The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably: Provided, that in all construction work eight hours shall constitute a day's work, and no Mongolian labor shall be employed thereon.

"Sec. 5. That the entryman upon lands to be irrigated by such works shall, in addition to compliance with the homestead laws, reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay to the government the charges apportioned against such tract, as provided in section four. No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no such right shall permanently attach until all payments therefor are made. The annual installments shall be paid to the receiver of the local land office of the district in which the land is situated, and a failure to make any two payments when due shall render the entry subject to cancellation with the forfeiture of all rights under this act, as well as of any moneys already paid thereon. All moneys received from the above sources shall be paid into the reclamation fund. Registers and receivers shall be allowed the usual commissions on all moneys paid for lands entered under this act.

"Sec. 6. That the Secretary of the Interior is hereby authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this act: Provided, that when the payments required by this act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior: Provided, that the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the government until otherwise provided by Congress."

"Sec. 10. That the Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations, as may be

necessary and proper for the purpose of carrying the provisions of this act into full force and effect."

It is thus seen that by the first section of the act Congress explicitly declares that the reclamation fund thereby created shall be used not only in the examination, survey, and construction of the irrigation works provided for, but also for their *maintenance,* and for the payment of all other expenses provided for in the act. In the fourth section, in authorizing the Secretary of the Interior to let contracts for the construction of any irrigation project he may have determined to be practicable, "in such portions or sections as it may be practicable to construct and complete as parts of the whole project," Congress expressly made that authority conditional upon the existence in the reclamation fund of available necessary funds for such portions or sections, and, furthermore, expressly declared that:

"The charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project" (public notice of which the Secretary was thereby directed to give) "shall be determined with a view of returning to the reclamation fund the estimated *cost of construction* of the project, and shall be apportioned equitably."

In the case of United States v. Cantrall (C. C.) 176 Fed. 949, cited and relied upon by the appellees, the court said that when section 4 of the act—

"empowered the Secretary of the Interior to fix and determine the charges against the land, it must have intended that he should thereby cover the cost of maintenance and operation while in control of the United States, as well as construction. I cannot find," said the learned judge, "anything in the language which makes it unlawful for the Secretary to divide the charges made by him against the land into two parts, one for construction and the other for maintenance and operation. It is true he is authorized by section 6 to use the reclamation fund for the operation and maintenance of the system until the management thereof passes to the landowners, but he is at the same time required by section 4 to levy such a charge against the land as will return to the fund the estimated cost thereof [of the system]. Unless, therefore, he has authority to cover the cost of operation and maintenance by charge upon the lands, the system must lie dormant and unused until the major portion of the entrymen shall pay the charges for cost of construction in full, or in time the fund will be exhausted and depleted, a result evidently not intended by Congress. Such a construction of the act is not required by its language, and would be inconsistent with its general intent and purposes."

Not only do we find nothing in section 4 of the act requiring the Secretary of the Interior to levy such a charge against the land as will return to the reclamation fund the *entire* estimated cost of the system, but we are of the opinion that the express declaration of Congress in the very same section, declaring that "the said charges shall be determined with a view of returning to the reclamation fund the estimated *cost of construction* of the project, and shall be apportioned equitably," precludes the reading into that section the further cost "of operation and maintenance" of the system: First, because to do so would be to legislate, which the court has no power to do; and, second, because it would be to legislate in direct contravention of other provisions of the same act, namely, of that provision of sec-

tion 5 where it is provided that the entryman upon lands to be irrigated by such works "before receiving patent for the lands covered by his entry shall pay to the government *the charges apportioned against such tract, as provided in section four,*" and of that portion of section 1 of the act which expressly declares that the reclamation fund shall be "used in the examination and survey for and the construction and maintenance of irrigation works, for the storage, diversion and development of waters for the reclamation of arid and semi-arid lands in the said states and territories, and for the payment of all other expenditures provided for in this act," and particularly in contravention of this express and explicit provision of section 6 of the act:

"That the Secretary of the Interior is hereby authorized and directed to use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this act: Provided, that when the payments required by this act are made for the major portion of the lands irrigated from the waters of any of the works herein provided for, then the management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby, to be maintained at their expense under such form of organization and under such rules and regulations as may be acceptable to the Secretary of the Interior: Provided, that the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the government until otherwise provided by Congress."

We confess ourselves unable to see any ambiguity in the act, and are of the opinion that the intent of Congress is plainly stated in its provisions. We must, therefore, take the law as we find it enacted, and give it effect without regard to the construction adopted by the Department of the Interior, and notwithstanding the opinion of the learned Attorney General (27 Opins. Atty. Gen. 360–374), for both of which we entertain, as we should, the highest respect. That the view we take of the act is in accord with what must have been the understanding of Congress in making the enactment is shown by these proceedings in the Senate and House of Representatives in reference to the measure, as disclosed by the Congressional Record. In the report of the Senate Committee (Cong. Rec. vol. 35, part. 3, page 2276) is the following:

"It also provides that the cost of operation and maintenance of reservoirs and irrigation works shall be paid from the irrigation fund, but when payments are made on the major portion of the lands irrigated under any project, the management and operation of all works, except reservoirs and the works necessary for their operation and production, shall pass to the owners of the land, to be maintained at their expense under rules prescribed by the Secretary."

And in the course of the speech of Representative Jones, of the state of Washington, now a Senator of that state, made in advocacy of the measure (Cong. Rec. vol. 35, part 7, p. 6753), is the following:

" * * * In other words, the government gets its money back. This payment, it may be said, however, goes into the reclamation fund to be re-expended. This is true, but whenever the government ceases to construct irrigation works and all the land is taken and paid for, the fund is entire and can be turned back into the general treasury, so that in the end the govern-

ment will receive all of its expenditures, except, probably, such amount as may be expended for maintenance."

And Representative Ray, speaking in opposition to the measure, said at page 6683 of volume 35, part 7, of the Congressional Record:

"It is conceded that the money never can come back, because the cost of maintenance or the cost of the extension and repairs will use all."

For the reasons stated, the judgment of the court below must be and is reversed, and the cause remanded for further proceedings in accordance with the views above expressed.

GILBERT, Circuit Judge (dissenting). Although the question of the construction of one of the provisions of the act here involved is not wholly free from doubt, I am of the opinion that the judgment of the court below should be affirmed for the following reasons:

1. It was clearly the intention of Congress that none of the reclamation fund should be dissipated in the construction or maintenance of reservoirs or of irrigation works, but that all moneys so expended should be returned to the fund, thereafter to be used in other similar projects. In American Tobacco Co. v. Werckmeister, 207 U. S. 284, 293, 28 Sup. Ct. 72, 74 (52 L. Ed. 208), the court said:

"But in construing a statute we are not always confined to a literal reading, and may consider its object and purpose, the things with which it is dealing, and the condition of affairs which led to its enactment, so as to effectuate rather than destroy the spirit and force of the law which the Legislature intended to enact."

In the opinion of the majority of this court certain language is quoted from the report of the Senate committee upon the bill when it was under consideration in that body, in which it was stated that the bill "provides that the cost of operation and maintenance of reservoirs and cost of works shall be paid from the irrigation fund." When the remainder of the report is read, however, it will be seen that the meaning of the passage so quoted is that such cost of operation and maintenance shall be paid in the first instance only from the irrigation fund, and that it was the understanding of the committee that the bill required that such expense be repaid to the fund by the entrymen on the irrigated lands, for the report says:

"By this method the fund will constantly be replenished, making irrigation practically a self-supporting enterprise, and, according to estimates by the geological survey, ultimately putting money into the treasury."

All that was said upon the subject in the debate in the Senate is in harmony with this idea. Thus, Senator Patterson expressed his belief that the proposed law was "so framed that the fund it produces will be a constantly accumulating fund." Another Senator said that the fund would "be perpetual," and another said that the bill provides for the "return of the fund." The same view is still more clearly expressed in the report of the committee of the House, which declares that the expenditure of the proceeds of the sales of public lands to be used under the bill was—

"by no means a direct expenditure, but is rather in the nature of a loan, inasmuch as the settler is to pay to the government the cost of the reclama-

tion of his land. * * * It is true that, if the bill becomes a law and works satisfactorily, in the course of time a large sum of money will be spent by the government in the construction of irrigation works; but under the provisions of the bill all of these sums are to be repaid, so that the reclamation fund, instead of decreasing, will constantly increase. The only actual expenditure under the bill not reimbursable would be certain items of administration, surveys, and examinations of projects, the construction of which, for one reason or another, might not be undertaken."

The quotation in the opinion of the majority of this court from the remarks of Mr. Ray is, I submit, misunderstood. When all that he said is considered, it will be seen that his objection to the bill was, not that the money expended in construction and maintenance would not come back to the reclamation fund, but that it would never come back to the "public treasury," for he said:

"Now, whatever comes back from the men who take up these lands is not, under this bill, to come back into the public treasury, and to be used for the benefit of all the people; but that money is to be used in the repair of existing, and in the construction and extension of other, irrigation works, and it is conceded, I may say, by the committee on irrigation, and conceded everywhere, that the public treasury will never get back the cost of construction."

And Mr. Ray predicted that, if the money was ever returned to the public treasury, it would be "away in the far-distant future, when the present generation and its descendants, their great-grandchildren and their great-great-grandchildren, are all gone." Mr. Mondell, in discussing the bill, said that it was the purpose thereof to require the settlers to "pay to the government every dollar of its expenditure in bringing water to their land, and in addition to that the great cost of building laterals, of leveling the land, and preparing it for irrigation." The only discordant note is found in the remarks of Mr. Jones, of Washington, who discovered in the language of the act ground for apprehending that the government would "probably" not get back the money expended for maintenance. Debates in Congress, however, are not appropriate sources from which to discover the meaning of statutes. Appropriate sources are the reports of the committees of either branch of Congress. Binns v. United States, 194 U. S. 486, 24 Sup. Ct. 816, 48 L. Ed. 1087; Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226.

2. The language of the statute is not repugnant to the evident intention of Congress. Section 1 of the act authorizes the expenditure of the money of the reclamation fund for the "construction and maintenance" of irrigation works. Section 6 directs the Secretary of the Interior to use that fund for the "operation and maintenance" of each of such works until the time when payments shall have been made for the major portion of the lands irrigated from the waters of such works, after which the management and operation shall pass to the owners of the lands irrigated. Section 4 provides for the repayment to the reclamation fund of the moneys so expended by charges equitably assessed against the settler, and it declares that:

"The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project."

I submit that the words "construction of the project" are used in a broad and comprehensive sense, and that they mean the construction, repair, and maintenance of the project, until it shall be turned over to the beneficiaries thereof under the provisions of section 6. The construction of an irrigation system thereafter to be delivered to others may fairly be said to involve the maintenance thereof until the time of delivery. Such maintenance and keeping in repair is included in the construction. The maintenance is the holding together that which is put together in construction. The word "construction," as used in statutes, has often been given such a meaning. Under a statute authorizing the issuance of bonds for "constructing public roads," it was held that the term "constructing" was used in a comprehensive sense, and meant not merely the construction of new roads, but meant the maintenance and betterment of roads already in existence. Western v. Hancock County, 98 Miss. 800, 54 South. 307. So it was held, under a statute authorizing cities and towns "to construct waterworks and light plants," that the words conferred authority to purchase waterworks and light plants already constructed by private enterprise. Seymour v. City of Tacoma, 6 Wash. 138, 32 Pac. 1077. And in construing an act which authorized the city of Brooklyn to "construct" a sewer, the court said:

"Nor do we think that the phrases 'to construct' and 'to be constructed' are, in the purview of this act, to be confined to the bare cost of building a sewer. Doubtless to construct is primarily to form; to build together; and the power to construct may in many cases end when the work of building is done. But here the power to construct is the power to keep together, as well as the power to put together, the power to maintain, protect, and preserve, as well as the power to erect." Matter of Application of Fowler, 53 N. Y. 60.

3. The contemporaneous construction of the statute by the executive officers of the government, whose duty it was to execute it, is in harmony with the legislative intent, as shown by the reports of the committees of the Senate and the House, and such construction should not be overruled "without cogent reasons." United States v. Moore, 95 U. S. 760, 24 L. Ed. 588; Pennoyer v. McConnaughy, 140 U. S. 1, 23, 11 Sup. Ct. 699, 35 L. Ed. 363.