GARNER *v.* LOWERY, COUNTY JUDGE.

5-106                                                 254 S. W. 2d 680

Opinion delivered February 9, 1953.

*Wood & Chesnutt* and *Ray S. Smith, Jr.,* for appellant.

*R. Julian Glover,* for appellee.

GEORGE ROSE SMITH, J. This is a taxpayer's suit brought by the appellant to prevent the county judge and other officers of Garland County from issuing bonds for the purchase of a county hospital and from levying a tax for its maintenance. The chancellor sustained a demurrer to the complaint and dismissed the suit.

The complaint alleges that in 1952 the county court entered an order by which it authorized the purchase of property known as the Methodist Hospital of Hot Springs, subject to the approval of the electorate. Later on the court employed an architect to prepare plans, specifications, and estimates of cost in connection with the purchase of the property and the construction of extensions thereto. These plans having been approved, the following proposal was placed on the ballot at the 1952 general election and was decisively approved by the voters: "$600,000 bond issue for the acquisition of the property formerly known as the Methodist Hospital of Hot Springs for a hospital for Garland County, and the construction of extensions thereto."

The complaint states that the county then gave notice that it would offer for sale $600,000 of bonds bearing interest at not more than 2.75% per annum, the purchaser to have the privilege of converting the bonds to a lower rate of interest upon such conditions that the county would receive no less and pay no more than it would have received and paid at the interest rate specified by the bidder. The bonds were sold to the highest bidder, who offered $600,707 for a $600,000 issue bearing interest at 2.15%. At the buyer's request the county agreed to convert the bonds to an issue of $619,500, of which $429,500 will bear interest at 1.75% and $190,000 will bear interest at 2%. It is conceded that the county's total payments of principal and interest on the converted

issue will not exceed what it would have had to pay had there been no conversion; in fact, there will be a saving of about $500.

The appellant contends that Amendment 17 to the constitution does not authorize a county to issue convertible bonds. We are unable to discern such a prohibition in the language of the amendment. Section 6 of Amendment 17 contains only two restrictions upon the issuance and sale of the bonds: they may not bear interest at more than 5%, and they must not be sold for less than par. It is hardly necessary to say that both these safeguards must be observed, but within these limitations the bonds may be sold "upon such condition and in such manner" as the county court may deem proper.

Nor does the conversion privilege run counter to the spirit of the amendment when, as here, the fact of conversion entails no additional expense to the county. The opportunity to convert the issue to a lower interest rate is evidently deemed valuable by prospective bidders and no doubt often enables the county to obtain an increased price in the sale of its securities. In many instances the legislature has expressly authorized the conversion of public bond issues; see, for example, Ark. Stats. 1947, §§ 13-1204, 13-1232, 21-639, 80-1106, and 80-1123. Under such a statute we have held that a percentage limitation upon a school district's bonded indebtedness applies only to the bonds as sold and not to the bonds as converted. *Lakeside Spec. Sch. Dist. etc. v. Gaines,* 202 Ark. 778, 153 S. W. 2d 149. We reasoned that "the total amount of the converted bonds, principal and interest, is the equivalent of the total amount, principal and interest, on the bonds contracted to be sold at the higher rate." We are guided by the same thought in our interpretation of Amendment 17.

A further suggestion, not urged in the briefs but raised in our study of the case, is that the ballot's designation of a "$600,000 bond issue" must be taken as a limitation on the principal amount of the bonds, whether converted or not. This thought has a degree of plausibility only because it fails to take into account the fact

that language may be placed upon a ballot for either of two purposes. On the one hand the ballot title may constitute an affirmative expression of the voter's will, as when he approves the levy of a tax "not to exceed 1½ mills." That phrase had appeared on the ballot considered in *Cisco* v. *Caudle, County Judge,* 210 Ark. 1006, 198 S. W. 2d 992, and we held that the county could not exceed the specified millage rate even though Amendment 17 permits a levy as high as five mills. "The electors might not know what a hospital would cost, but they would know what they are willing to pay in taxes to get one."

On the other hand, a ballot title is often intended primarily to provide the voter with condensed information about the issue he is asked to decide. In the case at bar we think the wording of the ballot falls clearly within this second category. Under Amendment 17 it is not necessary for the ballot to apprise the voter that a bond issue is contemplated, much less to specify its exact amount. *Rogers* v. *Parker, County Judge,* 211 Ark. 957, 203 S. W. 2d 401. While this ballot described a $600,000 bond issue, the interest rate was not even mentioned. Had a conscientious voter made a careful study of the law he would have learned that the bonds had to be sold at par and that the county judge might approve an interest rate as high as five per cent per annum. The voter, having approved the exercise of this much discretion by the county court, could not reasonably complain because the bonds bore only 2.15% interest instead of the maximum of 5%. Nor could he object to a converted issue that results in no added obligation on the part of the county. In casting his vote the elector is concerned with the future tax burden that he is assuming, not with the question of what part of that burden is to be technically denominated as principal and what part as interest.

The complaint asserts two other grounds for injunctive relief, but they may be disposed of quickly. It is argued that since Amendment 17 authorizes only "the construction, reconstruction, or extension" of a courthouse, jail, or hospital, the purchase of an existing hos-

pital is not contemplated. Of course the power to construct does not necessarily include the power to purchase, but that liberal interpretation has often been approved when the legislative intent was evidently directed to the fact of acquisition rather than to the method by which that result might be reached. *Ostrander* v. *City of Salmon,* 20 Idaho 153, 117 P. 692; *Verner* v. *Muller,* 89 S. C. 545, 72 S. E. 393; *Seymour* v. *City of Tacoma,* 6 Wash. 138, 32 P. 1077. The history of Amendment 17 shows that its purpose is to permit acquisition rather than to lay down a distinction between construction and purchase. In its original form this amendment applied only to courthouses and jails, and it was enough to authorize their construction, since such specialized structures are not to be had in the open market. Amendment 25 extended that authorization to include county hospitals, but there is no reason to suppose that in the case of hospitals the county was to be allowed to build but not to buy.

The final contention is that the county acted prematurely in submitting to the voters the issue of a hospital maintenance tax along with the proposal to purchase the Methodist Hospital. Amendment 32 recites that such a maintenance tax may be levied whenever "there is located a public hospital owned by" a county, and it is argued that the county did not own the hospital when the maintenance tax was authorized. We must reject this legalistic argument, as we do not think that the framers of Amendment 32 meant for a county hospital, whether constructed or purchased by the county, to lie idle until the next election, when a tax for its upkeep might lawfully be levied.

Affirmed.

McFADDIN, J., dissents in part.