Pat REEVES *v.* J. Randy YOUNG, Executive Director and
Secretary of the Arkansas Soil and Water Conservation
Commission, et al.

88-15 749 S.W.2d 327

Supreme Court of Arkansas
Opinion delivered May 16, 1988

*Darling & Graves*, by: *Peter R. Darling*, for appellant.

*Rose Law Firm, A Professional Association*, by: *George E. Campbell* and *David L. Williams; Steve Clark*, Att'y Gen., by: *Blake Hendrix*, Asst. Att'y Gen., for appellees.

TOM GLAZE, Justice. This case involves state general obligation bonds to be issued under Act 496 of 1981, as amended, for the purpose of developing water-resource projects.[1] Act 496 authorized the appellee, Arkansas Soil and Water Commission, to issue up to $100,000,000 in such bonds. The Commission was required, under the Act, to be the project owner and developer. Later, Act 280 of 1985 was enacted, amending Act 496 by removing the requirement that the Commission be the owner and allowing the Commission to make loans and grants to local governments to finance the construction of water-resource projects. Act 280 permits municipalities or water users' associations to own the project, rather than the Commission. Furthermore, while the parties never mentioned it in their arguments, we note that Act 280 also removed the condition found in Act 496 that no bonds issued could bear interest at a rate in excess of ten percent per annum.

Appellant brought this illegal taxation lawsuit, contending that Act 280 violates amendment 20 of the Arkansas Constitution and that the Commission should be enjoined from issuing any bond proceeds for loans or grants for water-resource projects not owned by the Commission. The Commission, in turn, argues that Act 280 complies with the requirements of amendment 20, since the Act did not enlarge the Commission's authority beyond that which the voters approved in 1982, and will not result in an

---

[1] Act 496 of 1981 is referred to as the "Arkansas Water Resources Development Act of 1981" and is compiled, as amended by Act 280 of 1985, in Ark. Code Ann. §§ 15-22-601 to -622 (1987). To facilitate discussion, we refer in our opinion only to the acts and not to the statutory codifications.

additional burden upon the taxpayers. The trial court ruled in the Commission's favor, but we reverse on appeal.

Citing amendment 20, appellant argues that the state can issue no bonds for any purpose whatsoever except by the consent of the electorate voting on the question at a general election or a special election called for that purpose. Here, appellant continues, Act 496 bonds were approved by the voters in 1982, but that Act 280 subsequently changed the purpose for which such bonds would issue by giving the Commission additional and broader authority than it was granted under Act 496. Appellant suggests the Commission's extended authority under Act 280 may well result in a greater burden upon the taxpayers.

Appellee counters appellant's arguments, claiming the purpose of Act 496 was not changed by Act 280, since the purpose of the bonds, their amount and the fact state revenues are pledged to repay the bonds were properly presented to and approved by the voters in the 1982 general election. Appellee further reasons that there is little, if any, difference between (1) the Commission owning a water-treatment plant which is leased to the local government and (2) the local government constructing the plant with a loan from the Commission, which is secured by revenue bonds issued by the local government. Appellee contends that in both instances the construction costs of the water-treatment facility will be repaid primarily with the revenues the facility generates.

The Commission cites *Garner* v. *Lowrey*, 221 Ark. 571, 254 S.W.2d 680 (1953), in support of its argument. While the factual issues in *Garner* deal with general obligation bonds issued under the terms contained in amendment 17 of the Arkansas Constitution, we agree with the Commission that the following proposition enunciated in *Garner* controls here: When voting on general obligation debt issues, voters are primarily concerned with the future potential tax burden that they may be assuming. We disagree, however, with the Commission's conclusion that Act 280 neither alters nor adds to the taxpayers' burden. Neither do we agree that Act 280 did not change the purpose of the bonds issued under Act 496.

In its argument, the Commission mainly discusses its authority, under Act 280, to make *loans* to local governments for

the building of such water-resource projects, but, in making this argument, the Commission generally ignores the fact that the Act also empowers it to give *grants* for such construction. While it is true that the state's bonded indebtedness for these projects cannot exceed the $100,000,000 limit the voters approved in 1982, the voters, in approving Act 496, never intended that the Commission grant, or bestow, bond proceeds to local government without some requirement that those proceeds be repaid. Such a grant, as the term implies, requires no repayment obligation on the part of the local government, and, without such obligation, the bonded indebtedness, evidencing that grant, would be paid directly from general revenues. In addition, because the municipality purchased, owned and constructed the facility, by the use of a grant, the state not only would have no recourse against the municipality, but it also would be unable to offset its losses by a foreclosure sale of the project.

Finally, we refer to Section 4(c) of Act 496 which, prior to Act 280, provided that no bonds could bear interest at a rate in excess of ten percent per annum. That interest rate limitation was removed by the enactment of Act 280. *See* Section 3 of Act 280 of 1985. Quite obviously, the voters' future potential tax burden could be increased if the Commission ever issued bonds in excess of the ten percent rate established in Act 496.[2]

For the reasons stated above, we hold Act 280 of 1985 is unconstitutional and the trial court's decision to the contrary is reversed.

---

[2] The Commission cites a Michigan case styled *Advisory Opinion on Constitutionality of 1982 PA 47*, 418 Mich. 49, 340 N.W.2d 817 (1983), which we do not find persuasive or controlling here. As the Commission points out, the Michigan Supreme Court determined that it was constitutional for the legislature to amend the interest rate for voter-authorized general obligation bonds without a vote of the people. The court relied, in part, on the fact the ballot reflected only a three-part question concerning the issuance of general obligation bonds and nothing contained in the question pertained to the maximum interest rate that such bonds could bear. We do not read our law so narrowly as to limit the requirements contained in an act, which authorizes the issuance of bonded indebtedness, only to those particulars set out in the ballot title and approved by the voters. *See Garner* v. *Lowery*, 221 Ark. at 574, 254 S.W.2d at 681-682. The language used here in Act 496 dictates a contrary result, providing that if issuance of the bonds is approved by a majority of the voters, the Commission shall proceed with the sale and issuance of the bonds as provided in this Act. *See* § 17 of Act 496 of 1981.

HICKMAN, J., concurs, HAYS, J., dissents.

DARRELL HICKMAN, Justice, concurring. My remarks are in no way intended to cast any shadow on the reputation of counsel for the appellees or any other lawyer or firm for that matter.

I believe this is a test case. If it is not, then I apologize. It is not an uncommon practice, especially in cases concerning government bonds, for counsel, as a condition of approving a bond issue, to seek a court decision on the legality of the bond issue. Two recent bond issue cases were undoubtedly test cases. *See Cortez* v. *Independence County*, 287 Ark. 517, 678 S.W.2d 291 (1985); *Murphy* v. *Epes*, 283 Ark. 517, 678 S.W.2d 352 (1984). In *Murphy*, counsel for the appellant announced that he was pleased he "lost" the case. Test cases are also filed on other financial legal questions. *See Winkle* v. *Grand National Bank*, 267 Ark. 123, 601 S.W.2d 559 (1980).

Speaking from what I have heard, or what is common knowledge, in a test case, a party and a lawyer are found who are willing to cooperate as "adversaries." Sometimes the suit is called a "friendly" lawsuit. I cannot say whether it is a common practice for the legal briefs of both sides to be prepared by one lawyer or not (the one bringing the test case), nor can I say whether the other lawyer is paid for his work. The practice probably varies. In this case both briefs are identical and appear to have been printed or typed at the same place.

We do not give advisory opinions as some states do, so test cases and friendly lawsuits have become a way to get a court decision in Arkansas before action is taken by interested parties. I have no particular quarrel with the practice.

Our legal system is based on the advocacy system where each party employs an attorney to present his case in the best possible light, the result hopefully being a fair resolution of the question. A test case is different; it invariably seeks a favorable predetermined answer to a question. Both sides are not independent and one side stands to lose nothing.

All the bond decisions that led to the abusive issuance of revenue bonds were probably test cases. Our decisions, which until *Purvis* v. *Hubbell*, 273 Ark. 330, 620 S.W.2d 282 (1981), went along with every deviation from the Arkansas Constitution,

might not have been the same if both this court and the public were fully aware of the circumstances of the test cases.

What should we do? Try to prevent the practice? Probably not. We could, as an ethical and procedural consideration, require the lawyers to divulge whether or not the case is a test case. It might be we would not consider such cases *res judicata. See Bailey* v. *Harris Brake Fire Protection Dist.*, 287 Ark. 268, 697 S.W.2d 916 (1985). At the very least test cases need to come out of the closet so we can see them for what they are.

STEELE HAYS, Justice, dissenting. On the basis of what is presented by this appeal, I would affirm the Chancellor, as the appellant has failed to overcome the strong presumption of constitutionality due legislative enactments. I believe the Chancellor was right to hold that changes effected by Act 280 of 1985, are not so substantial as to require another vote by the general public.

I do not know what to make of the change in the ceiling on the interest rate purportedly provided in Act 280, as neither side has discussed it. I would ask the parties to brief that point or would limit our holding to the issues presented.