278 P.3d 632 (2012)
174 Wn.2d 642
WASHINGTON ASSOCIATION FOR SUBSTANCE ABUSE AND VIOLENCE PREVENTION, a Washington nonprofit corporation; David Grumbois, an individual, Appellants, and
Gruss, Inc., a Washington corporation, Plaintiff,
v.
STATE of Washington, Respondent, and
John McKay, Bruce Beckett, Costco Wholesale Corporation, The Yes On 1183 Coalition, Washington Restaurant Association, MacKay Restaurant Group, Northwest Grocery Association, Safeway, Inc., The Kroger Company, and Family Wineries of Washington, Respondents/Intervenors.
No. 87188-4.
Supreme Court of Washington, En Banc.
Argued May 17, 2012.
Decided May 31, 2012.
*635 Michael Craig Subit, Frank Freed Subit & Thomas LLP, Seattle, WA, for Appellants.
Mary Maureen Tennyson, Washington Atty. General, Bruce L. Turcott, Ofc. of The Atty. General, Peter B. Gonick, Washington Attorney General's Office, Olympia, WA, for Respondent.
Michael K. Vaska, Foster Pepper PLLC, David John Burman, Attorney at Law, Ulrike Buschbacher Connelly, Perkins Coie, Seattle, WA, Kathryn Carder Mccoy, Foster Pepper PLLC, Seattle, WA, for Respondents/Intervenors.
Dmitri L. Iglitzin, Schwerin Campbell Barnard Iglitzin & Lav, Seattle, WA, James Gerard McGuinness, McGuinness & Streepy Law Offices L.L.C., Federal Way, WA, amicus counsel for General Teamsters Union Local No. 174 and United Food and Commercial Workers Local Union No. 21.
Hugh Davidson Spitzer, P. Stephen Dijulio, Foster Pepper PLLC, Seattle, WA, amicus counsel for Local Government Officials.
GONZÁLEZ, J.
¶ 1 This court was asked to determine whether Initiative 1183 (I-1183) violates the single-subject and subject-in-title rules found in article II, section 19 of the Washington State Constitution. I-1183 removes the State from the business of distributing and selling spirits and wine, imposes sales-based fees on private liquor distributors and retailers, and provides a distribution of $10 million per year to local governments for the purpose of enhancing public safety programs. We hold that appellants have not overcome the presumption that the initiative is constitutional, and therefore we affirm summary judgment in favor of the State and intervenors.

I. Facts
¶ 2 I-1183 was approved by 59 percent of voters in the November 2011 general election. Wash. Sec'y of State, November 08, 2011 General Election Results, http://vote.wa. gov/results/20111108/measures.html. The ballot title of I-1183 states:
Initiative Measure No. 1183 concerns liquor: beer, wine, and spirits (hard liquor).
This measure would close state liquor stores and sell their assets; license private *636 parties to sell and distribute spirits; set license fees based on sales; regulate licensees; and change regulation of wine distribution.
Should this measure be enacted into law?
[] Yes
[] No
State of Washington Voters' Pamphlet, General Election 19 (Nov. 8, 2011).
¶ 3 The Twenty-First Amendment to the United States Constitution ended federal prohibition of the manufacture, sale, or transportation of intoxicating liquors, allowing each state to develop its own system for regulating the presence and use of alcohol within its boundaries. Washington adopted the Washington State Liquor Act (Liquor Act) to regulate intoxicating liquors. Laws of 1933, Ex.Sess., ch. 62; Title 66 RCW. The Liquor Act created the Washington State Liquor Control Board (LCB), RCW 66.08.012, and authorized it to administer the comprehensive control scheme developed in the act, RCW 66.08.020.
¶ 4 Beginning with the adoption of the Liquor Act, Washington has established distinct regulatory systems to control the distribution and sale of different types of liquor. Laws of 1933, Ex.Sess., ch. 62. The legislature enacted a "three-tier" system to govern the distribution and sale of beer and wine, which provided different regulations and licensing requirements for manufacturers, distributors, and retailers. Former RCW 66.28.280 (2009). The distributor tier was included to prevent manufacturers from exerting undue influence upon retailers and to provide an efficient means of tax collection. Three-Tier Sys. Review Task Force, Wash. State Liquor Control Bd., Beer and Wine Three-Tier System Review Task Force Report 11 (Nov. 2006), available at http://www. leg.wa.gov/JointCommittees/SCBW/ Documents/6-10-2008_LCB.pdf.
¶ 5 The three-tier system also allowed the State to control the price at which manufacturers and distributors sold beer and wine. Manufacturers were prohibited from "discriminat[ing] in price in selling to any purchaser for resale," former RCW 66.28.170 (2004), and distributors were similarly required to maintain a wholesale price list for beer and wine, from which they were not allowed to deviate, former RCW 66.28.180(1) (2009). Distributors were also prohibited from offering quantity discounts or selling below acquisition cost. Former RCW 66.28.180(1)(d) (2009).[1]
¶ 6 Unlike the three-tier system that applied to beer and wine, prior to I-1183 the State had a monopoly over the distribution and sale of spirits. See former RCW 66.16.010 (2005); Wash. State Liquor Control Bd., FY 2010 Annual Report 9-10, available at http://liq.wa.gov/publications/2010-annual-reportfinal-web.pdf. State liquor stores and closely regulated contract liquor stores were the sole purveyors of spirits for consumers and businesses that sold spirits by the glass. Id. at 10.
¶ 7 The Liquor Act also created the Liquor Revolving Fund, which consists "of all license fees, permit fees, penalties, forfeitures, and all other moneys, income, or revenue received by the board." RCW 66.08.170. Since its adoption in 1933, the Liquor Act has provided that money in excess of the statutory minimum remaining in the Liquor Revolving Fund would be disbursed for a number of purposes unrelated to alcohol. See Laws of 1933, Ex.Sess., ch. 62, §§ 77, 78; RCW 66.08.190. Under the Liquor Act as it was originally approved, 30 percent of excess money in the Liquor Revolving Fund was to be distributed to the general fund of the State; 20 percent to the counties, to be placed in the old age pension fund; and the remaining 50 percent to the incorporated cities and towns of the state. Laws of 1933, Ex.Sess., ch. 62, § 78. Any city or town in which the sale of liquor was forbidden was not entitled to any share of the distributions; and if any unincorporated area of a county voted not to allow the sale of liquor, the population in that area would not be included in the computation of the population for distribution purposes. Id. § 78(2).
¶ 8 The Liquor Act currently provides funding for alcohol-related purposes, including the treatment of alcoholism, juvenile alcohol *637 and drug abuse prevention programs, and wine and grape research at Washington State University. RCW 66.08.180. The legislature has continued, however, to provide general funding for state and local governments. The current version of RCW 66.08.190, which was not amended or repealed by I-1183, provides for distributions from the Liquor Revolving Fund to counties, cities, towns, border areas, and the State's general fund. Cities and unincorporated areas in which the sale of liquor is forbidden as the result of an election are not entitled to any share in such distributions from the Liquor Revolving Fund. RCW 66.08.200 (unincorporated areas), .210 (cities).
¶ 9 Prior to the effort to pass I-1183, liquor reform promoters, including intervenor Costco Wholesale Corporation, supported attempts to modify the State's liquor regulation system through legislation and initiatives to the people. I-1183 was designed to address the primary concerns that its supporters felt had impeded prior attempts to reform Washington's liquor laws, such as maintaining tax levels and revenue streams; "ensuring adequate funding (and penalties) for licensing and enforcement missions of the Liquor Control Board and, in their discretion, for related public health and safety efforts provided by local governments"; and limiting the number and type of retail outlets that would sell spirits for off-premises consumption. Clerk's Papers (CP) at 711-12 (Decl. of John Sullivan, Associate General Counsel at Costco Wholesale Corp.).
¶ 10 I-1183 dramatically changed the State's approach to regulating the distribution and sale of liquor in Washington. The initiative proposed to "[g]et the state government out of the commercial business of distributing, selling, and promoting the sale of liquor, allowing the State to focus on the more appropriate government role of enforcing liquor laws and protecting the public health and safety concerning all alcoholic beverages." Laws of 2012, ch. 2, § 101(2)(b). To that end, I-1183 authorizes the State to auction off state liquor distribution and liquor store facilities and equipment. Id. § 102. The initiative allows private distributors to become licensed to distribute spirits, id. § 105, and allows a limited number of retail stores to sell spirits, id. § 103.
¶ 11 I-1183 imposes license fees on spirits retailers and distributors. Private retailers are required to pay a license issuance fee of 17 percent of their spirits revenue. Id. § 103(4). Retailers must also pay a flat license renewal fee of $166 per year. Id. § 103(5). Private distributors are required to pay a license issuance fee of 10 percent of revenue from sales of spirits made during the first two years and 5 percent of spirits revenue during subsequent years. Id. § 105(3)(a). Additionally, private distributors must pay an annual license renewal fee of $1,320 for each licensed location. Id. § 105(4). I-1183 provides that it "does not increase any tax, create any new tax, or eliminate any tax." Id. § 301.
¶ 12 I-1183 modifies the wine distribution system by allowing wine distributors and wineries to give discounts based upon competitive conditions, id. § 119, and allowing retailers and restaurants to distribute wine to their stores from a central warehouse, id. § 123. Wine retailers may also obtain retailer reseller endorsements, allowing them to sell wine to licensees who sell wine for consumption on their licensed premises. Id. § 104(2). An analogous retailer reseller endorsement was created for spirits retailers. Id. § 103(1).
¶ 13 The initiative additionally secures "the current distribution of liquor revenues to local governments and dedicate[s] a portion of the new revenues raised from liquor license fees to increase funding for local public safety programs, including police, fire, and emergency services in communities throughout the state." Id. § 101(2)(k). The additional portion is "ten million dollars per year from the spirits license fees [to] be provided to border areas, counties, cities, and towns through the liquor revolving fund for the purpose of enhancing public safety programs." Id. § 302.
¶ 14 I-1183 also modified the law pertaining to liquor advertising. The initiative removed a provision that prohibited the LCB from advertising liquor but maintained the LCB's "power to adopt any and all reasonable rules as to the kind, character, and *638 location of advertising of liquor." Id. § 108. I-1183 also added that the LCB is prohibited from restricting the "advertising of lawful prices." Id. § 107(7).
¶ 15 I-1183 also amended the policy reasons behind the State's regulation of alcohol. Id. § 124. Prior to I-1183, the Liquor Act listed the State's
goals of orderly marketing of alcohol in the state, encouraging moderation in consumption of alcohol by the citizens of the state, protecting the public interest and advancing public safety by preventing the use and consumption of alcohol by minors and other abusive consumption, and promoting the efficient collection of taxes by the state.
Former RCW 66.28.280 (2009). I-1183 removed the first two goals: orderly marketing of alcohol and encouraging moderation in consumption of alcohol. Laws of 2012, ch. 2, § 124.

II. Procedural History
¶ 16 Appellants, the Washington Association for Substance Abuse and Violence Prevention (WASAVP), and David Grumbois, an individual who leased land to the State for a liquor store, filed an action against the State, challenging I-1183. Appellants contend that I-1183 contains multiple subjects, in violation of article II, section 19's single-subject rule. Additionally, appellants claim that I-1183's multiple subjects were not all expressed in the ballot title of the initiative, in violation of article II, section 19's subject-in-title rule. Supporters of I-1183 filed a motion to intervene as defendants, which the trial court granted.
¶ 17 The parties moved for summary judgment. The trial court found that the distribution of $10 million to local governments for public safety programs was not sufficiently related to liquor and that I-1183 therefore violated the single-subject rule. The court found that material issues of fact existed regarding the severability of that section of the initiative, however, and ordered a trial on that issue.
¶ 18 Intervenors filed a motion for reconsideration, asserting that the public safety provision did not violate the constitution. The trial court changed its earlier decision, noting that the initiative's challengers had not sufficiently established the lack of a nexus between liquor regulation and public safety spending. The court granted the State's motion for summary judgment. This court granted direct review.
¶ 19 General Teamsters Local Union No. 174 and United Food and Commercial Workers Local Union No. 21 filed an amici brief in support of appellants. City and county government officials filed an amici brief expressing their interest in the implementation of I-1183 in their communities, particularly the allocation to local governments of liquor-related revenue for public safety purposes.

III. Issues
1. Does I-1183 violate the single-subject rule?
2. Does I-1183 violate the subject-in-title rule?

IV. Standard of Review
¶ 20 This court reviews summary judgment orders de novo. Pierce County v. State, 150 Wash.2d 422, 429, 78 P.3d 640 (2003).

V. Analysis

A. Standing
¶ 21 As an initial matter, intervenors contend that appellants lack standing to challenge I-1183. Br. of Intervenor-Resp'ts at 5 n.2. This court has established a two-part test to determine standing to seek a declaratory judgment under the Uniform Declaratory Judgments Act, chapter 7.24 RCW. Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 802, 83 P.3d 419 (2004). First, the interest sought to be protected must be "`arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Id. (internal quotation marks omitted) (quoting Save a Valuable Env't v. City of Bothell, 89 Wash.2d 862, 866, 576 P.2d 401 (1978)). Second, the challenged action must have caused the challenger an injury in fact, economic or otherwise. Id.
*639 ¶ 22 Appellants have standing to challenge I-1183. First, both appellants appear to have interests that are regulated by I-1183. WASAVP's goal of preventing substance abuse and violence places it within the zone of interests of I-1183, which broadly impacts the State's regulation of alcohol. Grumbois leased property to the State for use as a liquor store, and I-1183 removes the State from the business of running liquor stores. Laws of 2012, ch. 2, § 102.[2]
¶ 23 Second, both appellants have established injury in fact. Grumbois suffered injury because I-1183 required the State to terminate its lease with him. Although WASAVP has not suffered economic loss as a result of I-1183, its goals of preventing substance abuse could reasonably be impacted by I-1183's restructuring of Washington's regulation of liquor. Indeed, intervenors stress the established relationship between public safety and liquor, Br. of Intervenor-Resp'ts at 19, such that the increase in liquor availability would injure WASAVP's goals.

B. Article II, section 19
¶ 24 Turning to the constitutional challenges, appellants argue that I-1183 is unconstitutional under article II, section 19 of the Washington State Constitution. In approving an initiative measure, the people exercise the same power of sovereignty as the legislature does when it enacts a statute, Wash. Fed'n of State Emps. v. State, 127 Wash.2d 544, 556, 901 P.2d 1028 (1995), and are subject to the same constitutional limitations, City of Burien v. Kiga, 144 Wash.2d 819, 824, 31 P.3d 659 (2001). Therefore, even if an initiative is approved by a majority of voters, it will be struck down if it violates Washington's constitution. Id. This court presumes that an initiative is constitutional, just as it presumes the constitutionality of a statute duly enacted by the legislature. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000); Brower v. State, 137 Wash.2d 44, 52, 969 P.2d 42 (1998).
¶ 25 Article II, section 19 provides, "No bill shall embrace more than one subject, and that shall be expressed in the title." This provision is to be liberally construed in favor of the legislation. Amalgamated Transit, 142 Wash.2d at 206, 11 P.3d 762, 27 P.3d 608; Wash. Fed'n of State Emps., 127 Wash.2d at 555, 901 P.2d 1028. Nevertheless, "[w]e have declared that when laws are enacted in violation of this constitutional mandate, the courts will not hesitate to declare them void." State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 24, 200 P.2d 467 (1948) (Wash. Toll Bridge Auth. I). Article II, section 19 applies to initiatives as well as to bills. Wash. Fed'n of State Emps., 127 Wash.2d at 553-54, 901 P.2d 1028.
¶ 26 There are two distinct prohibitions in article II, section 19:(1) the single-subject rule and (2) the subject-in-title rule. Wash. Toll Bridge Auth. I, 32 Wash.2d at 23, 200 P.2d 467. For the reasons discussed below, we find that I-1183 does not violate either rule.

1. The single-subject rule
¶ 27 The single-subject rule aims to prevent the grouping of incompatible measures and to prevent "logrolling," which occurs when a measure is drafted such that a legislator or voter may be required to vote for something of which he or she disapproves in order to secure approval of an unrelated law. Wash. Fed'n of State Emps., 127 Wash.2d at 552, 901 P.2d 1028; Amalgamated Transit, 142 Wash.2d at 212, 11 P.3d 762, 27 P.3d 608.
*640 ¶ 28 In determining whether legislation contains multiple subjects, we begin with the title of the measure. Amalgamated Transit, 142 Wash.2d at 207, 11 P.3d 762, 27 P.3d 608. The ballot title of an initiative is the relevant title for analysis under article II, section 19, not the legislative title, if any exists. Wash. Fed'n of State Emps., 127 Wash.2d at 555, 901 P.2d 1028. A ballot title consists of a statement of the subject of the measure, a concise description of the measure, and the question of whether or not the measure should be enacted into law. RCW 29A.72.050. A title may be general or restrictive; "in other words, broad or narrow, since the legislature in each case has the right to determine for itself how comprehensive shall be the object of the statute." Gruen v. State Tax Comm'n, 35 Wash.2d 1, 22, 211 P.2d 651 (1949), overruled in part on other grounds by State ex rel. Wash. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963). "In assessing whether a title is general, it is not necessary that the title contain a general statement of the subject of an act; `[a] few well-chosen words, suggestive of the general subject stated, is all that is necessary.'" Amalgamated Transit, 142 Wash.2d at 209, 11 P.3d 762, 27 P.3d 608 (alteration in original) (quoting State ex rel. Scofield v. Easterday, 182 Wash. 209, 212, 46 P.2d 1052 (1935)).
¶ 29 The parties agree that the ballot title is general, and we find so as well. I-1183's title indicates that it generally pertains to the broad subject of liquor. See id. at 208-11, 11 P.3d 762, 27 P.3d 608 (providing examples of general and restrictive titles).
¶ 30 Where a title is general, "`[a]ll that is required [by the constitution] is that there be some "rational unity" between the general subject and the incidental subdivisions.'" State v. Grisby, 97 Wash.2d 493, 498, 647 P.2d 6 (1982) (quoting Kueckelhan v. Fed. Old Line Ins. Co., 69 Wash.2d 392, 403, 418 P.2d 443 (1966)). "[T]he existence of rational unity or not is determined by whether the matters within the body of the initiative are germane to the general title and whether they are germane to one another." Kiga, 144 Wash.2d at 826, 31 P.3d 659 (citing Amalgamated Transit, 142 Wash.2d at 209-10, 11 P.3d 762, 27 P.3d 608); Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 638, 71 P.3d 644 (2003). There is no violation of article II, section 19 even if a general subject contains several incidental subjects or subdivisions. Wash. Fed'n of State Emps., 127 Wash.2d at 556, 901 P.2d 1028; Grisby, 97 Wash.2d at 498, 647 P.2d 6. Moreover, "`[f]or purposes of legislation, "subjects" are not absolute existences to be discovered by some sort of a priori reasoning, but are the result of classification for convenience of treatment and for greater effectiveness in attaining the general purpose of the particular legislative act.'" State ex rel. Wash. Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 33, 377 P.2d 466 (1962) (Wash. Toll Bridge Auth. IV) (quoting State ex rel. Test v. Steinwedel, 203 Ind. 457, 467, 180 N.E. 865 (1932)); Amalgamated Transit, 142 Wash.2d at 209-10, 11 P.3d 762, 27 P.3d 608.
¶ 31 Appellants argue that the challenged provisions lack rational unity with the general topicwhich they characterize as "`liquor privatization'"and with one another. Br. of Appellants at 23. Appellants contend that I-1183 violates the single-subject rule because along with the general topic of liquor privatization, the initiative includes a $10 million public safety earmark, privatizes wine distribution, impacts liquor advertising, and modifies the State's policy regarding liquor.
¶ 32 Turning first to the public safety earmark, this provision is germane to the general topic of I-1183, whether that is liquor or the narrower subject of liquor privatization, as appellants suggest. Although the public safety earmark is not restricted to use for facially liquor-related safety issues, see Laws of 2012, ch. 2, § 302, liquor has an obvious connection to broader public safety concerns than might feasibly be addressed by a more limited earmark. As local government officials assert in their amici brief, the burden of enforcing liquor sales laws and prosecuting offenders falls heavily on local governments. Br. of Amici Curiae Local Gov't Officials at 15; RCW 66.44.010(1) ("All county and municipal peace officers are hereby charged with the duty of investigating and prosecuting all violations of this title...."). Additionally, many violations of the Liquor Act are misdemeanors or gross misdemeanors, *641 punishable by imprisonment in the county jail. See RCW 66.44.140 (classifying unlawful sale of liquor as a gross misdemeanor and establishing punishment of confinement in county jail), .180. It would be improper to overlook the impact that changes to liquor regulation could have on general public safety expenditures by local governments.
¶ 33 Moreover, the legislature's recognition of the relationship between liquor regulation and public welfare supports our finding that these issues share rational unity. See Wash. Fed'n of State Emps., 127 Wash.2d at 575, 901 P.2d 1028 (Talmadge, J., concurring in part/dissenting in part) (proposing that considering whether the legislature has historically treated issues together is relevant to analysis of a law under the single-subject rule). Indeed, the general purpose of the Liquor Act is "for the protection of the welfare, health, peace, morals, and safety of the people of the state," RCW 66.08.010; Barrett v. Lucky Seven Saloon, Inc., 152 Wash.2d 259, 273, 96 P.3d 386 (2004), and the Liquor Act has provided general revenue for the state and for local governments since its first enactment, Laws of 1933, Ex.Sess., ch. 62, §§ 77, 78. I-1183's provision of funds for public safety actually has a closer nexus to the subject of liquor than does the general revenue provision that has existed since the State began regulating liquor.
¶ 34 On the other hand, appellants contend that the liquor reform supporters' prior unsuccessful attempts to privatize liquor distribution and sales demonstrate the existence of logrolling in I-1183; in other words, that the initiative was designed to attract voters who did not approve of liquor privatization but did favor an increase in funding for public safety programs. See Br. of Appellants at 24. Nevertheless, given the State's continued recognition of the connection between liquor regulation, public safety, and revenue generation, we find that appellants have not established that I-1183's public safety earmark is the result of logrolling, rather than the product of permissible law making.
¶ 35 Appellants next argue that I-1183's privatization of the distribution and sale of spirits is not germane to its deregulation of the private distribution of wine, in violation of the single-subject rule. Br. of Appellants at 26-30. Appellants rely on prior decisions in which this court has found that although the challenged provisions of a law may have shared a general subject outlined in the title of the measure, the provisions did not share a rational unity among one another. In Barde v. State, 90 Wash.2d 470, 584 P.2d 390 (1978), for example, this court reviewed the constitutionality of an act "`relating to the taking or withholding of property,'" which created criminal sanctions for dognapping and allowed recovery of attorney fees in a civil replevin action. Id. at 471, 584 P.2d 390 (quoting Laws of 1972, 1st Ex.Sess., ch. 114). The court found that although the two provisions may have been germane to the topic of taking or withholding property, there was no rational unity between criminal sanctions for dognapping and attorney fees in a civil action. Id. at 472, 584 P.2d 390. The court struck down the law under article II, section 19. Id. at 470, 472, 584 P.2d 390.
¶ 36 In Amalgamated Transit, this court reviewed the constitutionality of Initiative 695, which set license tab fees at $30 and required voter approval of all future state and local tax increases. 142 Wash.2d at 191, 11 P.3d 762, 27 P.3d 608. We found that the initiative's subjects were germane to the general topic of tax limitation but that there was no rational unity between the subjects. Id. at 217, 11 P.3d 762, 27 P.3d 608. The court held that the initiative violated the single-subject rule. Id.
¶ 37 In Kiga, this court considered the constitutionality of Initiative 722, which sought to nullify specific tax increases and to change the method of assessing property taxes. 144 Wash.2d at 827, 31 P.3d 659. Both provisions related to the general topic of tax relief, but the court found that they were not germane to one another. Id. The first provision would reverse various tax increases and provide a one-time refund, implicating a number of different types of charges, while the change in tax assessment would be permanent and restricted to property taxes. Id. The court found that the initiative violated the single-subject rule. Id. at 828, 31 P.3d 659.
*642 ¶ 38 There is a closer nexus between I-1183's provisions affecting spirits and wine, however, than there was in the relevant provisions examined in Barde, Amalgamated Transit, and Kiga. Unlike the subjects combined by the law examined in Barde, spirits and wine share the common distinction of being liquor and have been governed as such by the same act for decades. See Laws of 1933, Ex.Sess., ch. 62, § 3 (defining "liquor"). Moreover, unlike the subjects at issue in Amalgamated Transit and Kiga, I-1183's changes to the regulation of spirits and wine do not combine a specific impact of a law with a general measure for the future. See Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762, 27 P.3d 608; Kiga, 144 Wash.2d at 827, 31 P.3d 659; see also Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 523-25, 304 P.2d 676 (1956) (Wash. Toll Bridge Auth. II) (finding an act embraced two subjects because it granted continuing power to build toll roads and provided for the construction of a particular toll road).
¶ 39 Appellants next contend that I-1183's change to liquor advertising regulations is unrelated to the rest of the initiative. Br. of Appellants at 30-31. This argument lacks merit, as liquor advertising is germane to the general subject of I-1183, as well as to the individual provisions of the initiative.
¶ 40 Finally, appellants assert that the modifications to the legislative findings on the three-tier system constitutes a separate subject. Id. at 31. Policy expressions, however, do not contribute additional subjects within the meaning of the single-subject rule. Pierce County, 150 Wash.2d at 434, 78 P.3d 640. I-1183's policy changes do not constitute a different subject from the rest of the initiative.[3]

2. The subject-in-title rule
¶ 41 The purpose of the subject-in-title rule is to notify members of the legislature and the public of the subject matter of a measure. Power, Inc. v. Huntley, 39 Wash.2d 191, 198, 235 P.2d 173 (1951). "`[A] title complies with the constitution if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law.'" Wash. Fed'n of State Emps., 127 Wash.2d at 555, 901 P.2d 1028 (alteration in original) (quoting Young Men's Christian Ass'n v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963)). The title need not be an index to the contents, nor must it provide details of the measure. Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762, 27 P.3d 608 (citing Wash. Fed'n of State Emps., 127 Wash.2d at 555, 901 P.2d 1028). Although a measure's title can be broad and generalwithout any particular expressions or words requiredthe material representations in the title must not be misleading or false, which would thwart the underlying purpose of ensuring that "no person may be deceived as to what matters are being legislated upon." Seymour v. City of Tacoma, 6 Wash. 138, 149, 32 P. 1077 (1893); Howlett v. Cheetham, 17 Wash. 626, 635, 50 P. 522 (1897) ("[A] title which is misleading or false is not constitutionally framed."). Any "`objections to the title must be grave and the conflict between it and the constitution palpable before we will hold an act unconstitutional.'" Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 372, 70 P.3d 920 (2003) (internal quotation marks omitted) (quoting Nat'l Ass'n of Creditors v. Brown, 147 Wash. 1, 3, 264 P. 1005 (1928)).
¶ 42 As an initial matter, intervenors assert that the pre-election review under RCW 29A.72.080 was the appropriate proceeding for appellants to challenge I-1183's *643 title and that appellants are now precluded from raising a subject-in-title challenge. Br. of Intervenor-Resp'ts at 43-46. Under RCW 29A.72.080, a person may challenge the ballot title of an initiative in Thurston County Superior Court within five days of its filing with the Secretary of State. The superior court then examines the ballot title, measure, and objections "and shall, within five days, render its decision...." RCW 29A.72.080. This preliminary decision regarding the ballot title is final. Id. Intervenors rely on Kreidler v. Eikenberry, 111 Wash.2d 828, 834, 766 P.2d 438 (1989), in which this court refused to review the ballot title decision of a superior court and noted that "the public interest is served by finality in this matter." Kreidler is inapposite to this case, however, as appellants do not challenge the result of the ballot title determination, but rather the constitutionality of the law itself. Intervenors' interpretation of Kreidler and analogous cases would improperly constrain any constitutional challenge to initiatives to the expedited process of ballot title adjudication.
¶ 43 Appellants argue that the "license fees based on sales" listed in the ballot title are actually taxes and that I-1183 violates the subject-in-title rule because the title does not notify voters that the charges imposed are taxes. Br. of Appellants at 43. Words in the title of legislation "`must be taken in their common and ordinary meanings, and the legislature cannot in the body of an act impose another or unusual meaning upon a term used in the title without disclosing such special meaning therein.'" Amalgamated Transit, 142 Wash.2d at 226, 11 P.3d 762, 27 P.3d 608 (internal quotation marks omitted) (quoting DeCano v. State, 7 Wash.2d 613, 626, 110 P.2d 627 (1941)). I-1183 imposes "license issuance fees" on spirits retailers and distributors, calculated as a percentage of sales that is deposited into the Liquor Revolving Fund. Laws of 2012, ch. 2, § 103(4) (retailers); id. § 105(3) (distributors). The issue is thus whether the phrase "license fees based on sales," found in I-1183's ballot title, is misleading or false. See Seymour, 6 Wash. at 149, 32 P. 1077.
¶ 44 Appellants assert that we should refer to legal distinctions between taxes and fees, Br. of Appellants at 44, but that would ignore the subject-in-title rule's purpose of providing notice to the public of the contents of the measure, see Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762, 27 P.3d 608. We turn instead to the common meaning of the term "fee" because "[i]n construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it." W. Petroleum Imps., Inc. v. Friedt, 127 Wash.2d 420, 424, 899 P.2d 792 (1995); see also Seymour, 6 Wash. at 149, 32 P. 1077 ("As the constitution has not indicated the degree of particularity necessary to express in its title the subject of an act, the courts should not embarrass legislation by technical interpretations based upon mere form or phraseology.").
¶ 45 In Amalgamated Transit, the initiative at issue asked whether "`voter approval [shall] be required for any tax increase,'" without indicating that the definition of "tax" included in the body of the measure was broader than the ordinary definition of the term. 142 Wash.2d at 227, 11 P.3d 762, 27 P.3d 608. As defined in the body of the initiative, "tax" included a variety of specific taxes as well as "`impact fees, license fees, permit fees, and any monetary charge by government.'" Id. at 193, 11 P.3d 762, 27 P.3d 608. The court found that other, narrower definitions, such as "`a forced contribution of wealth to meet the public needs of a government,'" likely accorded with the general informed voter's understanding of the term "tax." Id. at 219, 11 P.3d 762, 27 P.3d 608 (quoting Webster's Third New International Dictionary 2345 (1986)). The court found the initiative violated the subject-in-title rule because its title did not give notice to voters that the meaning of "tax" in the measure was broader than its common meaning. Id. at 227, 11 P.3d 762, 27 P.3d 608.
¶ 46 In DeCano, this court considered the constitutionality of a statute entitled "`An Act relating to the rights and disabilities of aliens with respect to land[s],'" which amended an act that prohibited ownership of land by aliens. 7 Wash.2d at 623-24, 110 P.2d 627 (quoting Laws of 1921, ch. 50, at 156). Respondents contended that the statute *644 violated the subject-in-title rule because it modified the definition of "alien," without indicating that change in its title. Id. at 623-24, 110 P.2d 627. The earlier act provided that "`"[a]lien" does not include an alien who has in good faith declared his intention to become a citizen of the United States.'" Id. at 623, 110 P.2d 627. The amendatory statute, however, expanded the definition of "alien" to "`include all persons who are non-citizens of the United States and who are ineligible to citizenship by naturalization.'" Id. at 624, 110 P.2d 627. The court noted that the amendatory statute's definition of the term "brings within its purview a whole new class of persons who are not in fact aliens in common understanding, by judicial construction, or under the express definition contained in the prior law."[4]Id. The court found that the title of the amendatory law gave no indication of this expanded definition and that it therefore violated article II, section 19. Id. at 624, 627, 110 P.2d 627.
¶ 47 Unlike the titles of the laws at issue in Amalgamated Transit and DeCano, I-1183's ballot title provided voters with adequate notice of the scope and purpose of the license fees. A common understanding of the term "fee" is "a charge fixed by law or by an institution (as a university) for certain privileges or services ...." Webster's Third New International Dictionary 833 (2002). The license issuance fees under I-1183 correspond with this common meaning, as they are charges for the privilege of selling liquor in Washington State. It is important to note that I-1183's ballot title accurately states that the "license issuance fees" included in the body of the initiative are based on sales. Cf. Amalgamated Transit, 142 Wash.2d at 227, 11 P.3d 762, 27 P.3d 608 (noting that the ballot title asked voters whether "`voter approval [shall] be required for any tax increase' without any indication in the title that `tax' has a meaning broader than its common meaning"); DeCano, 7 Wash.2d at 624, 110 P.2d 627 (finding that the title of the statute "states that it pertains to the rights of `aliens' with respect to land, but it gives no intimation whatsoever that the body of the act contains an amended definition of the word `alien'"). The phrase "license fees based on sales" is sufficient to indicate to an inquiring mind the scope and purpose of that provision of I-1183.
¶ 48 The challenged portion of I-1183's ballot title is not palpably misleading or false. We have defined "fee" as a legal term of art in some particular contexts. See, e.g., Covell v. City of Seattle, 127 Wash.2d 874, 879, 905 P.2d 324 (1995) (applying factors to determine whether a charge imposed by the government is a tax or regulatory fee). But we will not void a law duly enacted by voters based upon "the technical significance of a word, where it can hardly be contended that anyone was likely to be deceived." Seymour, 6 Wash. at 149, 32 P. 1077. On numerous occasions, we have rejected ballot title challenges based on nuances between terms. See, e.g., id. ("The real purpose of this act would have been better expressed had the word `provide' been used, but we think the word `construct,' under all the circumstances, may be accorded a similar meaning...."); N. Cedar Co. v. French, 131 Wash. 394, 418-19, 230 P. 837 (1924) (holding that "agricultural product" referenced in title included forestry product, based on liberal construction of the constitutional provision and the "`broad sense'" of the term), modified on other grounds on reh'g, 133 Wash. 692, 233 P. 39 (1925). We find that the phrase "license fees based on sales" accurately expresses the underlying subject contained in the body of the initiative.[5]

*645 VI. Conclusion
¶ 49 Appellants have not overcome the presumption that I-1183 meets the Washington State Constitution's single-subject and subject-in-title rules under article II, section 19. We affirm the trial court's order of summary judgment in favor of the State and intervenors.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, SUSAN OWENS, JAMES M. JOHNSON, and DEBRA L. STEPHENS, Justices.
WIGGINS, J. (dissenting).
¶ 50 When citizens legislate through the initiative process, they are held to the same standards as our elected lawmakers. When corporations legislate by initiative, we must also hold them to those same standards.
¶ 51 Article II, section 19 of our state constitution declares:
No bill shall embrace more than one subject, and that shall be expressed in the title.
This provision has been part of the basic framework of our state's government for over 150 years, appearing not only in our state constitution at its original adoption, but in the Organic Act of 1853 establishing Washington as a territory.[1] Article II, section 19 is a cornerstone of good government, ensuring that our lawmakers legislate honestly. Article II, section 19's single-subject and subject-in-title rules require our elected legislators to enact laws with forthrightness and clarity. We demand the same of initiatives.
¶ 52 Initiative Measure 1183 (I-1183), which privatizes our state liquor industry, allows hard liquor to be sold at grocery stores and other retail establishments, and dramatically changes state regulation of liquor distribution and sales. But I-1183 also imposes new taxes and contains a $10 million earmark[2] that has nothing to do with liquor. An initiative can impose new taxes, but the ballot title cannot misleadingly imply that it does not. Likewise, earmarking a portion of the new tax revenue for public safety is not inherently problematic, but article II, section 19 precludes combining a substantive liquor privatization law with an earmark that has no rational relation to liquor privatization and may have been included only to win votes. I respectfully dissent.

I. I-1183 violates the subject-in-title rule because it fails to properly notify voters that it raises taxes
¶ 53 Under article II, section 19's subject-in-title rule, a law is unconstitutional if its title fails to put the public, legislators, or voters on notice of its contents. Power, Inc. v. Huntley, 39 Wash.2d 191, 198, 235 P.2d 173 (1951). In essence, the rule requires legislators to be honest about what is contained in a law. Seymour v. City of Tacoma, 6 Wash. 138, 148-49, 32 P. 1077 (1893) ("The object of the requirement that the subject of an act shall be expressed in its title is, that no person may be deceived as to what matters are being legislated upon."); Howlett v. Cheetham, 17 Wash. 626, 635, 50 P. 522 (1897) ("[A] title which is misleading and false is not constitutionally framed."); State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 24-25, 200 P.2d 467 (1948) (one purpose of the subject-in-title rule is to prevent surprise or fraud). A law is unconstitutional if its title fails to "`give[] notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law.'" Wash. Fed'n of State Emps. v. State, 127 Wash.2d 544, 555, 901 P.2d 1028 (1995) (quoting Young Men's Christian Ass'n v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963)). The rationale behind this rule is obvious: when laws are passed, people should know what is in them, *646 especially those voting on the laws. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 207, 11 P.3d 762, 27 P.3d 608 (2000). No one should be unpleasantly surprised to learn after voting for a law that it includes provisions one opposes. The rule is particularly important for initiatives because "often voters will not reach the text of a measure or the explanatory statement, but may instead cast their votes based upon the ballot title." Id. at 217, 11 P.3d 762, 27 P.3d 608.
¶ 54 The title of I-1183 fails to notify the public that it imposes taxes, instead misleadingly implying that it does not. Our subject-in-title rule condemns such a classic bait-and-switch, rendering I-1183 unconstitutional. This case is controlled by Amalgamated Transit, in which the title of the initiative referred to "taxes" but the substantive provisions of the initiative defined "taxes" far more broadly than the public understanding of the word, violating the subject-in-title rule. Here, the title of I-1183 refers to "license fees" but then imposes "license fees" that are actually taxes and would be understood by the public to be taxes. Just as in Amalgamated Transit, the title violates the subject-in-title rule of article II, section 19.

a. I-1183's ballot title implies that it imposes only "license fees based on sales," not taxes
¶ 55 When we analyze initiatives under the subject-in-title rule, we look to the ballot title. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028. By statute, the ballot title consists of a statement of the subject of the measure, a concise description of the measure, and the question of whether or not the measure should be enacted into law. RCW 29A.72.050. We treat the whole ballot title as the initiative's "title." Amalgamated Transit, 142 Wash.2d at 211-12, 11 P.3d 762, 27 P.3d 608.
¶ 56 I-1183's ballot title reads as follows:
Initiative Measure
1183
Proposed by initiative petition:
Initiative Measure No. 1183 concerns liquor: beer, wine, and spirits (hard liquor).
This measure would close state liquor stores and sell their assets; license private parties to sell and distribute spirits; set license fees based on sales; regulate licensees; and change regulation of wine distribution.
Should this measure be enacted into law?
[] Yes
[] No
State of Washington Voters' Pamphlet, General Election 19 (Nov. 8, 2011).
¶ 57 This ballot title is consistent with I-1183's text, if not its substance. Section 103 of the initiative imposes so-called "license fees" on hard liquor retailers:
(4) Each spirits retail licensee must pay to the board, for deposit into the liquor revolving fund, a license issuance fee equivalent to seventeen percent of all spirits sales revenues under the license....
(5) In addition to the payment required under subsection (4) of this section, each licensee must pay an annual license renewal fee of one hundred sixty-six dollars....
Laws of 2012, ch. 2, § 103, available at http:// apps.leg.wa.gov/documents/billdocs/2011-12/ Pdf/Bills/Session% 20Law% 202012/INITIATIVE1183.SL.pdf. Similarly, section 105 imposes license fees on hard liquor distributors:
(3)(a) ... each spirits distributor licensee must pay to the board for deposit into the liquor revolving fund, a license issuance fee calculated as follows:
(i) In each of the first two years of licensure, ten percent of the total revenue from all the licensee's sales of spirits made during the year for which the fee is due, respectively; and
(ii) In the third year of licensure and each year thereafter, five percent of the total revenue from all the licensee's sales of spirits made during the year for which the fee is due, respectively.
....
(4) In addition to the payment set forth in subsection (3) of this section, each spirits distributor licensee renewing its annual license must pay an annual license renewal fee of one thousand three hundred twenty dollars for each licensed location.
*647 Finally, section 301 of the initiative states that these license fees are not taxes:
This act does not increase any tax, create any new tax, or eliminate any tax.
Thus, the title of I-1183 is consistent with the text of I-1183, since the initiative claims to impose only "license fees." But the title is not consistent with the substance of I-1183.

b. In substance, I-1183 imposes new taxes, not just fees
¶ 58 To determine the meanings of "license fee" and "tax" for a subject-in-title challenge, we look to their common and ordinary meanings. Wash. State Grange v. Locke, 153 Wash.2d 475, 495, 105 P.3d 9 (2005). We determined the common and ordinary meaning of "tax" in Amalgamated Transit: it is a "`pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes: a forced contribution of wealth to meet the public needs of a government.' Webster's Third New International Dictionary 2345 (1986)." Amalgamated Transit, 142 Wash.2d at 219-20, 11 P.3d 762, 27 P.3d 608. A fee is "a charge fixed by law or by an institution ... for certain privileges or services." Webster's Third New International Dictionary 833 (2002). But a license fee also connotes something different from a tax; the money collected for a fee does not go toward public needs, but toward the cost of regulation, or is actually a key part of the regulation. Franks & Son, Inc. v. State, 136 Wash.2d 737, 750, 966 P.2d 1232 (1998). In other words, the common and ordinary understanding is that a tax supplements the public treasury, while a fee circles back to the regulator to cover the cost of regulation. Id.; Amalgamated Transit, 142 Wash.2d at 220-21, 11 P.3d 762, 27 P.3d 608.
¶ 59 We have explored this common and ordinary meaning in more detail in our case law, specifically articulating the difference between a tax and a regulatory fee. We have said that a tax is a levy made for the purpose of raising revenue for a general governmental purpose, while a regulatory fee is enacted principally as an integral part of the regulation of an activity or to cover the cost of regulation. See Franks & Son, 136 Wash.2d at 750, 966 P.2d 1232. To determine whether a charge is a tax or a fee, we consider three factors:
"[W]hether the primary purpose ... is to accomplish desired public benefits which cost money, or whether the primary purpose is to regulate[;]"
[W]hether the money collected must be allocated only to the authorized regulatory purpose[; and]
[W]hether there is a direct relationship between the fee charged and the service received ... or between the fee charged and the burden produced by the fee payer.
Covell v. City of Seattle, 127 Wash.2d 874, 879, 905 P.2d 324 (1995) (quoting Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 809, 650 P.2d 193 (1982)).[3] These factors reflect commonsense concepts. Despite Respondents' contentions, the Covell test is not a technical, legalistic definition unknown to the common voter. It reflects commonly held understandings, as we held in Amalgamated Transit. 142 Wash.2d at 220-21, 226, 11 P.3d 762, 27 P.3d 608. The test is essentially a rigorous way to flesh out a difference that we have previously held the average voter understands. Id.
¶ 60 Applying the Covell factors to this case leaves no doubt that the I-1183 "license issuance fees" are taxes. All three factors point to a tax, leaving little room for serious debate. First, the purpose of the "license issuance fees" is not to regulate liquor at all, nor is it to provide services. The purpose is to replace and supplement the revenue stream that previously came from profits on the sale of liquor. That revenue stream is not dedicated solely to alcohol regulationin fact, much of it goes straight to the public treasury, either to the general fund or to cities and counties. See RCW 66.08.190; *648 Laws of 2012, ch. 2, § 101(2)(k) (the initiative will "[m]aintain the current distribution of liquor revenues to local governments ..."). Under Covell's second factor, to be considered a fee instead of a tax, it is "`essential' that the money collected be segregated and `allocated only to the authorized regulatory purpose.'" Samis Land Co. v. City of Soap Lake, 143 Wash.2d 798, 809-10, 23 P.3d 477 (2001) (quoting Covell, 127 Wash.2d at 879, 905 P.2d 324). Here, there is no requirement that the money collected be allocated to regulating liquor or even to alcohol-related purposes. Instead, the money is funneled to a variety of sources, with much of it going to local government programs and the general fund. See Laws of 2012, ch. 2, § 102. Finally, under the third factor, there is no relationship between the fee charged and either services provided or regulatory burdens produced by the fee payer. The fee increases with sales even though increased sales do not create equivalent increases in services or burdens.
¶ 61 Analysis of these factors settles the issue: the so-called "license fees" are really taxes. This conclusion is confirmed by the initiative itself, which includes flat yearly "license renewal fees," which likely cover the actual regulatory burden of issuing a license. These are the real license fees. The percentage-based charges are essentially sales taxes imposed on the seller.
¶ 62 During Abraham Lincoln's trial lawyer career, Lincoln is said to have cross-examined a witness as follows:
"How many legs does a horse have?"
"Four," said the witness.
"Right," said Abe.
"Now, if you call the tail a leg, how many legs does a horse have?"
"Five," answered the witness.
"Nope," said Abe, "callin' a tail a leg don't make it a leg."
Lamon v. McDonnell Douglas Corp., 19 Wash.App. 515, 534-35, 576 P.2d 426 (1978) (Andersen, J., dissenting). Calling a tax a license fee does not make it a license fee.

c. I-1183 violates the subject-in-title rule and is unconstitutional because its title misleadingly implies that it imposes only "license fees," not taxes
¶ 63 A ballot title that implies something untrue fails to put the public on notice of what is contained in the initiative. Seymour, 6 Wash. at 148-49, 32 P. 1077; Howlett, 17 Wash. at 635, 50 P. 522. The core reason for including article II, section 19 in our constitution was to ensure fairness, forthrightness, and clarity in the legislative process. I-1183 fails this purpose because it misleads voters, falsely suggesting it contains no new taxes when in reality it does.
¶ 64 This case is controlled by Amalgamated Transit. There, we found a subject-in-title violation in I-695 because the title referred to "taxes," but in the text of the act, "taxes" was defined to include not just taxes but also license fees and other charges. Amalgamated Transit, 142 Wash.2d at 220-21, 11 P.3d 762, 27 P.3d 608. I-1183 has the same defect. The title of I-1183 refers to "license fees," but those "license fees" include not only bona fide "license renewal fees," but also "license issuance fees," which are in fact taxes. Thus, the common meaning of "license fees" is broadened in the same way "taxes" was broadened in Amalgamated Transit, resulting in the same failure of notice. Id. Moreover, the drafters of the initiative in Amalgamated Transit likely used the word "taxes" for the same reason (voters will vote to limit them) that the drafters of I-1183 avoided it (voters will not vote to raise them). Since this case follows the precise logical pattern as Amalgamated Transit, we are bound by our prior reasoning and cannot ignore it. When reviewing initiatives and recent legislation, perhaps more than in any other context, it is crucial that we adhere to our past precedents to avoid any appearance that we are just voting our preferences to undo results achieved at the ballot box or in the halls of our legislature.
¶ 65 The majority reasons that the ballot title's reference to "license fees based on sales" puts inquiring minds on notice of what the bill doesthat it raises taxes. Majority at 644. In essence, this argument assumes that the average voter simply does not know or care whether a given charge is a tax or a fee. We held to the contrary in Amalgamated *649 Transit that the average voter considers taxes and fees to be two different things. 142 Wash.2d at 220-21, 226, 11 P.3d 762, 27 P.3d 608. We specifically stated that "[t]he average informed voter would not conclude that the charge for a state's nurse's license, for example, is a `tax' in its traditional sense." Id. at 221, 11 P.3d 762, 27 P.3d 608. Under Amalgamated Transit, the title of I-1183 put the voter on notice that it imposed license fees; it did not put the voter on notice of the imposition of a new tax.
¶ 66 Common sense confirms this distinction. Voters do not like taxes. See Joshua D. Rosenberg, The Psychology of Taxes: Why They Drive Us Crazy, and How Can We Make Them Sane, 16 Va. Tax Rev. 155, 157 (1996) ("Among all kinds of legislative and judicial decision making, only tax laws seem capable of engendering nearly universal anger, anxiety, paranoia and outright hatred...."). If we were to hold that license fees and taxes are basically the same to an ordinary voter, we would be assuming that the average voter is either mistaken about, uninformed of, or unable to appreciate the difference between a tax and a fee. This is not only wrong, it is contrary to our case law. Amalgamated Transit, 142 Wash.2d at 220-21, 11 P.3d 762, 27 P.3d 608.
¶ 67 It could be argued (although certainly none of the parties take this position)[4] that all our constitution requires is for the ballot title to match the text of the initiative, not for the ballot title to match the substance of the initiative. Under this view, article II, section 19 is a procedural technicality, not a substantive good government provision that ensures honest and forthright legislation. Article II, section 19 is not merely a tidy drafting provision; it is "the most salutary provision in our state constitution." State ex rel. Arnold v. Mitchell, 55 Wash. 513, 516, 104 P. 791 (1909).
¶ 68 We should not create a loophole that would invite the drafters of initiatives to mislead the public. Just as it is misleading to call a liquor tax a "license fee," the next law could raise the business and occupation tax, calling it a "business regulations fee," or the sales tax, calling it a "transactional license fee." A law is not unconstitutional merely because it raises taxes without expressly saying so in the title. To be sure, plenty of broadly titled laws raise taxes to achieve legislative goals without the title stating, "this bill raises taxes." But a title cannot contain false or misleading information. If a title affirmatively implies that it does not raise taxes whereas the legislation in reality raises taxes, it violates article II, section 19's subject-in-title rule.

II. I-1183 also violates the single-subject rule because it contains a $10 million public expenditure earmark that has nothing to do with liquor
¶ 69 The Washington State Constitution does not allow lawmakers to cobble together unrelated pieces of legislation to garner votes. Nor does it allow legislators to attach unpopular laws to popular laws in order to gain approval for legislation that would not otherwise pass, a practice commonly known as "logrolling."[5]Wash. Fed'n, 127 Wash.2d at 552, 901 P.2d 1028; Amalgamated Transit, 142 Wash.2d at 212, 11 P.3d 762, 27 P.3d 608.
¶ 70 The single-subject rule was included in our constitution to prevent logrolling. Wash. Fed'n, 127 Wash.2d at 552, 901 P.2d 1028. By requiring bills to contain only one subject, our constitution ensures that every bill passes or fails on its own merits, not *650 because a bill drafter was able to creatively ice the legislative cake with a popular provision. See, e.g., Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 525, 304 P.2d 676 (1956). Like the subject-in-title rule, the single-subject rule is a critical safeguard of honest governance.
¶ 71 I agree with the majority that most provisions in I-1183 do not violate the single-subject rule. But I depart from the majority because I-1183 violates the single-subject rule in that the $10 million public safety earmark has no rational unity with liquor privatization.

a. I-1183 contains a $10 million public expenditure earmark
¶ 72 Section 302 of I-1183 does two things: (1) it preserves existing fund distributions to local governments under prior liquor laws and (2) it guarantees local governments an additional $10 million under the new "license fee" revenue stream for "the purpose of enhancing public safety programs":
The distribution of spirits license fees under sections 103 and 105 of this act through the liquor revolving fund to border areas, counties, cities, towns, and the municipal research center must be made in a manner that provides that each category of recipients receive, in the aggregate, no less than it received from the liquor revolving fund during comparable periods prior to the effective date of this section. An additional distribution of ten million dollars per year from the spirits license fees must be provided to border areas, counties, cities, and towns through the liquor revolving fund for the purpose of enhancing public safety programs.
Laws of 2012, ch. 2, § 302. Although the $10 million set-aside must be spent on "public safety programs," neither party disputes that there is no requirement the money be spent on anything directly related to alcohol. Further, the money is not put toward carrying out any other part of the initiative. Instead, it goes straight to local government treasuries.

b. The $10 million earmark has no rational unity with the main subject of I-1183 (liquor) or to other provisions contained therein
¶ 73 We begin our analysis of the single-subject rule by determining whether the title of the bill is general or restrictive. Where, as here, the bill has a general title,[6] we look to see whether there is "rational unity" between the general subject and the incidental subdivisions. State v. Grisby, 97 Wash.2d 493, 498, 647 P.2d 6 (1982). Rational unity exists where all subjects contained in the bill are (1) germane to the general subject and (2) germane to one another. City of Burien v. Kiga, 144 Wash.2d 819, 826, 31 P.3d 659 (2001). The single-subject rule does not, "`by restricting the contents of an "act" to one subject, contemplate a metaphysical singleness of an idea or thing, but rather that there must be some rational unity between the matters embraced in the act, the unity being found in the general purpose of the act and the practical problems of efficient administration.'" State ex rel. Wash. Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 33, 377 P.2d 466 (1962) (quoting State ex rel. Test v. Steinwedel, 203 Ind. 457, 468, 180 N.E. 865 (1932)).
¶ 74 On its face, the earmark for public safety has no relationship to liquor (or the practical problems of efficiently administering I-1183) other than that the money paying for it comes from a liquor tax. This alone is not enough. The overriding purpose of the single-subject rule is to prevent logrolling, i.e., cobbling together unrelated legislation to garner votes. Wash. Fed'n, 127 Wash.2d at 552, 901 P.2d 1028. Earmarking is a classic form of logrolling. In many ways, it is the most pernicious form of all because it calls to mind explicit vote-buying, securing support for legislation by funding pet projects or otherwise catering to the desires of undecided voters.
¶ 75 We will allow earmarks where they are sufficiently related to the topic of the underlying legislation. See, e.g., Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 371, 70 P.3d 920 (2003) (upholding an earmark for tobacco-related programs only *651 because the earmark related to the subject of the initiative, tobacco); Yelle, 61 Wash.2d at 38, 377 P.2d 466 (upholding an earmark for highway funds only because it related to the subject of the initiative, toll bridges, and ferrieswhich were part of the highway system). This strikes a fair balance between curtailing logrolling on the one hand and allowing lawmakers a free hand to legislate on the other. This approach makes sense because the more an earmark has to do with the subject of a bill, the less likely it is that it was inserted solely to garner votes, and vice versa. However, we have never explicitly held that it violates the single-subject rule to combine substantive law with a wholly unrelated earmark.[7] We should do so now. This is a fair and sensible rule supported by our case law that balances the competing concerns at stake and fulfills the purpose of article II, section 19.
¶ 76 Respondents make several unconvincing arguments that the public safety earmark is in fact related to liquor. First, respondents argue that "public safety" is rationally connected to liquor. On a theoretical level, this is undoubtedly true. The consumption of liquor increases public safety risks; drunk driving and alcoholism come quickly to mind. Thus, the State contends that funneling liquor tax money into public safety ameliorates the damage done by the initiative or is a hedge against the increased public safety risk that would come along with higher liquor consumption and easier access to liquor. If this were the case, there would certainly be rational unity between the earmark and the rest of the initiative.
¶ 77 The State's argument is flawed because the proponents of I-1183 never acknowledged that privatizing liquor would lead to increased consumption or public safety risk. Those concerns were raised by the initiative's opponents. More importantly, the $10 million earmark simply does not hedge against alcohol-related risk. It could have done soif the initiative had devoted $10 million to alcohol-related programs, there would be a clear hedge against risk and a rational unity between the substantive law and the earmark. Instead, the initiative allows money to be allocated to any local government public safety program, potentially including programs as unrelated to alcohol as tsunami warning systems, earthquake preparedness, or building code compliance. The entire range of public safety programs cannot possibly have rational unity with I-1183. When the connection between an earmark and substantive law is so remote, the danger of logrolling is high, and such a connection cannot meet our constitution's requirement that earmarks be related to the underlying substantive law.[8]
¶ 78 Second, respondents make an "historical practice" argument that liquor money has historically been devoted to local government public safety programs, creating rational unity between liquor and these programs. Thus, the earmark is merely a continuation of historical practice. There does appear to be some support in our case law for the idea that historical practice can inform our rational unity analysis, albeit in concurrences and dissents rather than in majority opinions. See, e.g., Wash. Fed'n, 127 Wash.2d at 575, 901 P.2d 1028 (Talmadge, J., concurring in part/dissenting in part). If historical practice were relevant to determining rational unity, and if the $10 million earmark simply replaced a preexisting liquor revenue stream with the earmark, one might argue that the *652 earmark satisfies the rational unity test. See Ass'n of Neighborhood Stores, 149 Wash.2d at 370-71, 70 P.3d 920. But I-1183 instructs the State how it must spend new revenues that did not exist before. Thus, the earmark is not a subject that has historically been combined with liquor because the revenue it appropriates never existed prior to the passage of the initiative. Instead, the law designates a new distribution of funds going forward that does not reflect historical practicein effect a reallocation of legislative priorities rather than a proportional slice of a larger pie.
¶ 79 Heavy reliance on historical practice also misses the point of the single-subject rule. The point is not that liquor money can never be spent on public safety programs unrelated to liquor. Of course it can. The single-subject rule imposes no limitations on how tax money can be spent. The point is that every law must rise or fall on its own merits. A $10 million earmark to local governments belongs in a different bill than a liquor privatization law, and if they had been enacted separately, there would be no violation of the single-subject rule.
¶ 80 Our responsibility is not to continue past historical practices but to determine the constitutionality of I-1183 as passed. For all the reasons stated here, I-1183 fails to satisfy our constitution. In any event the history of liquor privatization initiatives suggests a particularly high danger of logrolling. The year before I-1183 passed, two liquor privatization initiatives were rejected by the voters. Following their initial defeat, the initiative's proponents met with various stakeholders and added several provisions to the law, most notably the $10 million earmark for local government programs. The second time around, the bill passed. We cannot know for certain whether the earmark was added to I-1183 only to garner votes or whether the drafters legitimately sought to address public safety concerns. But the fact remains that the initiative did not pass until the earmark was added.

III. The constitutional defects in I-1183 are not severable, and the law should be struck down in its entirety
¶ 81 A legislative act is unconstitutional in its entirety if the invalid provisions cannot be severed, meaning that (1) it cannot reasonably be believed that the act would have passed without the invalid portions or (2) elimination of the invalid portion would render the remaining part useless to accomplish the legislative purpose. Amalgamated Transit, 142 Wash.2d at 227-28, 11 P.3d 762, 27 P.3d 608. While a severability clause may sometimes "provide the assurance that the legislative body would have enacted remaining sections even if others are found invalid," id. at 228, 11 P.3d 762, 27 P.3d 608, the existence of a severability clause is not dispositive of the issue. Leonard v. City of Spokane, 127 Wash.2d 194, 201, 897 P.2d 358 (1995).
¶ 82 I-1183's severability clause cannot save the initiative from complete invalidation. Because the earmark provision is not rationally related to the subject of privatizing liquor sales, it violates the single-subject provision. We have held that an initiative that violates the single-subject rule must be voided in its entirety. Kiga, 144 Wash.2d at 825, 31 P.3d 659. "When an initiative embodies two unrelated subjects, it is impossible for the court to assess whether either subject would have received majority support if voted on separately. Consequently, the entire initiative must be voided." Id.
¶ 83 But even if we were concerned only with the subject-in-title violation, it still does not follow that a majority of voters would have voted for the initiative without the new taxes. The State admits that the new taxes were added to replace the revenue stream provided by liquor sales. The legislative purpose of reforming liquor distribution would not be practicable without replacing that revenue stream, nor would the initiative likely have garnered popular support if it left a giant hole in the State's finances. Consequently, the constitutionally infirm portions of I-1183 cannot be severed from the valid portions, and I-1183 should be struck down in its entirety.

CONCLUSION
¶ 84 This case demonstrates precisely why our founding fathers included article II, section *653 19 in our constitution: so that laws are passed fairly, honestly, and on their individual merits. Article II, section 19 holds our lawmakers to exacting standards to ensure that legislation is honestly come-by; we must hold citizen and corporate legislators to no less. Kiga, 144 Wash.2d at 824, 31 P.3d 659. This initiative would violate the constitution if our legislature had passed it, and it is equally unconstitutional as an initiative of the people.
¶ 85 I respectfully dissent.
WE CONCUR: CHARLES W. JOHNSON, and MARY E. FAIRHURST, Justices.
CHAMBERS, J. (concurring in part and concurring in dissent in part).
¶ 86 I join the dissenting opinion in part. Initiative Measure 1183 violates the subject-in-title rule of article II, section 19 of the Washington State Constitution because a reference to "license fees based on sales" in the initiative title is insufficient to alert voters to the fact that the bill contains a new tax. I write separately because I also agree with the majority that there is a rational unity between liquor regulation and public safety and that the appellants' other arguments asserting a violation of article II, section 19's single-subject rule are meritless. But the violation of the subject-in-title rule is sufficient to invalidate the initiative, and I concur with the dissent's ultimate disposition that the initiative is unconstitutional.
NOTES
[1] I-1183 left these restrictions in place for beer. See Laws of 2012, ch. 2, §§ 119, 121.
[2] Intervenors argue that appellants are required to show that they are within the zone of interests of the law asserted as a basis for the challenge (Const. art. II, § 19), not the law targeted by the challenge (I-1183). Br. of Intervenor-Resp'ts at 5 n.2. The authority intervenors cite stands for the opposite proposition. In Grant County, the court found that fire districts lacked personal standing to bring a constitutional challenge against certain annexation statutes because the fire districts were not in the zone of interests of the statutes. 150 Wash.2d at 803, 83 P.3d 419. Similarly, in To-Ro Trade Shows v. Collins, the court found that a vehicle trade show producer lacked standing to bring a claim against a dealer licensing statute because the producer was not a vehicle dealer and therefore was not in the zone of interests protected by the statute. 144 Wash.2d 403, 414-15, 27 P.3d 1149 (2001).
[3] Appellants additionally contend that I-1183 is not "comprehensive" and that the provisions impacting spirits and wine are separate subjects because they deal with discrete parts of a larger topic. Br. of Appellants at 26-27. This argument lacks merit. The cases cited by appellants merely state the rule that broad, comprehensive legislation does not necessarily violate the single-subject rule, not that legislation must be comprehensive to avoid violating the single-subject rule. See, e.g., Kueckelhan, 69 Wash.2d at 403-04, 418 P.2d 443 (finding that the comprehensive insurance code did not violate the single-subject rule by establishing the offices of insurance commissioner and state fire marshal); McQueen v. Kittitas County, 115 Wash. 672, 682, 198 P. 394 (1921) (article II, section 19 was not intended to prevent enactment of a complete law on a given subject).
[4] Although we considered the judicial and statutory definitions of the term "alien" in DeCano, the court apparently used that analysis to inform its understanding of the common and ordinary meaning of the term, rather than to impose a technical legal definition of the term onto its common meaning. See DeCano, 7 Wash.2d at 626, 110 P.2d 627 ("`Words in a title must be taken in their common and ordinary meanings....'" (quoting 59 C.J. Statutes § 390, at 810 (1932))); see also Amalgamated Transit, 142 Wash.2d at 219, 11 P.3d 762, 27 P.3d 608 ("Language in an initiative should be construed as the average informed voter voting on the initiative would read it.").
[5] The dissent focuses on the legal distinction between taxes and fees, but we find that this analysis ignores our role of construing the language of the initiative as the average informed voter would have read it. See Amalgamated Transit, 142 Wash.2d at 219, 11 P.3d 762, 27 P.3d 608. We leave for another day the issue of whether the "license fees based on sales" withstands scrutiny under the legal definition of a "fee."
[1] See ch. 90, § 6, 10 Stat. 172, 175 (1853); see also City of Fircrest v. Jensen, 158 Wash.2d 384, 403-04, 143 P.3d 776 (2006).
[2] An "earmark" is money that is "set aside for a specific purpose or recipient." Black's Law Dictionary 584 (9th ed. 2009).
[3] Respondents are incorrect in suggesting we have applied Covell only to taxes at the municipal level, not the state level. See, e.g., Franks & Son, 136 Wash.2d at 750-51, 966 P.2d 1232 (applying Covell test to Washington Utilities and Transportation Commission charge to determine whether it was a tax or a regulatory fee); Dean v. Lehman, 143 Wash.2d 12, 27-28, 18 P.3d 523 (2001) (applying Covell test to Washington State Department of Corrections charge to determine whether it was a tax).
[4] There is one possible exception. Counsel for Intervenor-Respondent Costco appeared to endorse this position at oral argument, suggesting that a title would not violate article II, section 19 even if it included a falsehood. Wash. Supreme Court Oral Argument, Wash. Ass'n for Substance Abuse & Violence Prevention v. State, No. 87188-4 (May 17, 2012), at 46 min., 28 sec., video recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org.
[5] The phrase refers to an old frontier custom of neighbors working together to move logs that each had cut, which would be more difficult to move without help. Black's Law Dictionary defines "logrolling" as "[t]he legislative practice of including several propositions in one measure... so that the legislature or voters will pass all of them, even though these propositions might not have been passed if they had been submitted separately." Black's Law Dictionary 1026 (9th ed. 2009).
[6] The parties do not dispute that the title is general. Clerk's Papers at 1617.
[7] However, we have held on numerous occasions that it violates article II, section 19 to include substantive law in an appropriations bill. Wash. State Legislature v. State, 139 Wash.2d 129, 145, 985 P.2d 353 (1999).
[8] It is something of an open question whether our "rational unity" test resembles a "rational basis" test in that we are required to give credence to hypotheticals that are unlikely to occur. See, e.g., Loparex, LLC v. MPI Release Technologies, LLC, 964 N.E.2d 806 (Ind.2012) ("`[I]f there is any reasonable basis for grouping together in one act various matters of the same nature, and the public cannot be deceived thereby, the act is valid.'" (quoting Stith Petroleum Co. v. Dep't of Audit & Control of Ind., 211 Ind. 400, 409, 5 N.E.2d 517, 521 (1937))). For example, in theory, local governments could allocate every penny of the money they receive from I-1183 to alcohol-related programs. But this possibility is, at best, extremely improbable. In any event, given the dangers of logrolling here, the mere possibility that money could be allocated to alcohol-related purposes is too tenuous to uphold an otherwise deeply flawed law.